UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Case No.: No. 04-CR-10366-MLW |
| | ) |
| v. | ) |
| | ) |
| TODD LECCESE | ) |
| | ) |
| Defendant | ) |
| | ) |
| | ) |
| | ) |

**DEFENDANT TODD LECCESE'S SENTENCING**
**MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE**

Defendant Todd Leccese respectfully requests that the Court sentence him to a

term of imprisonment below the applicable Guidelines range based on the factors set

forth below.

**I.      PERSONAL BACKGROUND**

Leccese was raised in a middle-class family in Saugus, Massachusetts.  Aside

from difficulties involving his parents' divorce and a brief period where his father was

incarcerated, Leccese enjoyed a reasonably nice childhood and continues to enjoy close

family relations.  His family members describe him as the "rock" that held the family

together during the divorce.

Although not a particularly strong student (he graduated 152 out of 203 students

at Saugus High School), Leccese understood the value of an education and persevered

through two years at Dean Junior College where he received an Associate's Degree in

Business in 1993.

Through hard work, in the years following his graduation from Dean, Leccese

became a very successful young businessman in a variety of different ventures.  He ran

both the Lynn and New Hampshire divisions of his father's rubbish company until it was sold in 1998. He also proved to be a savvy real estate investor, buying multiple residential properties, fixing them up and subsequently selling them for a profit. He also owned and operated a discount furniture business in Chelsea, Massachusetts. Until the beginning of the conduct that forms the basis for the current case, Leccese's business endeavors – and successes – were wholly legitimate. Although he has no one to blame but himself for his current legal problems, such problems resulted from his allowing himself to fall in with the "wrong crowd" – the type of people he had steered clear from during his childhood and early adult years. He has paid dearly for his poor judgment in this regard.

The "good crowd" list of individuals who have written letters to the Court on Leccese's behalf is long and distinguished, and their heartfelt fondness for him is telling. This list of those offering Leccese support through their correspondence to the Court includes the Special Counsel to the General Counsel at the "Big Dig" and former Chief Administrative Judge and Chief Counsel for the Massachusetts Highway Department, a Superior Court Officer, a Jesuit priest who is a professor of philosophy at Boston College, a retired Saugus police officer, a federal court security officer and United States Marine Corps Purple Heart recipient from the Viet Nam War, an elementary school teacher and various local businessmen and women.

While all of the letters are attached hereto (Attachment 1) for the Court's consideration, certain passages deserve mention in the body of this memorandum. Notably, Leccese's selflessness comes through in the correspondence. For example, Rosalie Milano, a former neighbor, writes of the assistance Leccese provided to the

"elderly neighbors on the block" and that "he is always willing to lend a helping hand and pitching in whenever needed."  Rita O'Brien (who recently passed away), a Branch Manager at Citizens Bank, recalled a time where Leccese helped her with car problems in the freezing cold and had the problem fixed.  She further wrote that he "has always made himself available to . . . those less fortunate."  Daniel and Cynthia Prezloso remember that Leccese was a "frequent visitor and supportive friend" during their son's recovery from a tragic accident that resulted in the loss of a leg.  Annette Mikulski, Leccese's former kindergarten teacher, writes about Leccese taking care of his mother as she went through the difficulties associated with her divorce.  Joseph Zito describes Leccese as "always there to give someone a helping hand and never wanted anything in return."  Gloria Mucci discusses how the year before his arrest Leccese "donated toys to St. Rose's Church in Chelsea for 600 families."  Further, "during snow storms he used his truck to plow out all his family, friends and neighbors on Gilway, the street where he grew up in Saugus, without being asked or without remuneration."  Salvatore Mucci writes about how Leccese helped his mother financially and emotionally through her divorce and bouts with breast cancer.

The letters from Leccese's family and friends also discuss his shame over his actions and request the Court to consider leniency based on his character in general. Notably, no one seeks to make excuses for Leccese, only to bring his positive attributes to the Court's attention.  For example, Tanya Gioldasis, Leccese's twin sister writes:

> Lastly, I would like to convey to you how sorry, embarrassed and remorseful Todd is by his actions.  I know his actions would never be repeated, and here we are as his family, faced with his absence, the loss enormous and inexpressible.  So please, if there is anyway to reduce the severity of his sentence I ask you your Honor, please consider all that I have said, and know just how sorry we all are, especially Todd.

Lisa Morgante, Leccese's older sister, writes: "I, as well as my family, understand the severity and seriousness of the charges my brother is facing. But if there is anyway to diminish the harshness of his sentencing, please take into consideration that he has had no prior record and up until this point, has been a model citizen. My family is heartbroken by his recent imprisonment and begs for your leniency during his sentencing." Diane Leccese, defendant's mother writes, "We all recognize the seriousness of the offence. I know Todd feels terrible remorse for what he has done and that the wrongful behavior will never be repeated. The thought of losing my only son is devastating and sometimes unbearable. Me and my family are just heart broken."

Peter Milano, former Chief Administrative Judge for the Massachusetts Highway Department and current President of the East Boston Salesians Boys and Girls Club writes, "I understand that some punishment is warranted in this case. However, I also know that Todd has the ability to make many positive contributions to society upon his release. I honestly feel that the interests of society are best served by Todd being out of prison." Ronald Tacelli, the Jesuit priest writes, "Todd, I know, is deeply remorseful, and is aware what tragic repercussions his actions have had on others, including his own family. I would respectfully ask that, when he is being judged, this other and very real side to him be taken fully into account." Finally, former police officer and federal security officer Nicholas Hartt writes, "I am not writing today to defend Todd for the actions that put him before you today. I am writing to appeal to your sense of compassion as you pass sentence on Todd. I believe in my heart that Todd is every bit the good person he was growing up and that any mistakes he made has not diminished the good qualities of a person he is."

4

## II.    LEGAL ARGUMENT

### A.    Leccese's Guidelines Range

Pursuant to *United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (2006), although the United States Sentencing Guidelines are no longer mandatory, *see United States v. Booker*, 125 S.Ct. 738, 764 (2005), "at sentencing, the district court must continue to consider the Guidelines sentencing range." *Jimenez-Beltre, supra* (citations omitted). "In most cases, this will mean that the district court will have to calculate the applicable guidelines range including the resolution of any factual or legal disputes necessary to that calculation-unless they do not matter-before deciding whether to exercise its new-found discretion to impose a non-guidelines sentence." *Id.*

### B.    Calculation Pursuant to U.S.S.G. 2K1.4

#### 1.    Introduction

The Probation Department calculated the defendant's Total Offense Level as 26, with a guideline range of 63-78 months.   The defendant disagrees.  The Total Offense Level should be 22, yielding a range of 41-51 months.[1]

The disagreement centers on the Probation Department's choice to utilize § 2K1.4(a)(1)(A) for Group 2 – the July 23, 2003 fire – rather than § 2K1.4(a)(1)(B) as it did for Groups 1 and 3.  Probation argues that the defendant "knowingly" created a substantial risk of serious bodily harm or death for the Count 2 fire.  Probation's position would establish a Base Offense Level of 24.  The defendant asserts that any risk was not created "knowingly" and the Base Offense Level should be 20 for Group 2.   As reflected by the Plea Agreement, the government – which has a significantly greater understanding

---

[1] Although the statute under which the defendant was charged, 18 U.S.C. § 844(i), provides for a statutory minimum of 60 months, the government has agreed to file a motion under 18 U.S.C. § 3553(e) authorizing the Court to sentence below the minimum. (Plea Agreement, ¶ 6b.)

of the underlying facts – agrees that Mr. Leccese did not knowingly create a substantial risk of serious bodily harm or death.

### 2.    United States v. Ruiz

*United States v. Ruiz*, 105 F.3d 1492 (1997), remains the leading First Circuit case defining the term "knowingly" as it is used in § 2K1.4(a)(1)(A). *Ruiz* held "a defendant can be found to have 'knowingly' created a substantial risk of death or serious bodily injury under § 2K1.4 *only* if the defendant was *aware* that a substantial risk of death or serious bodily injury was '*practically certain*' to result from the criminal act." *Id.* at 1507-08 (emphases added). "Negligence", "should have known" or even "recklessness" is not sufficient. *Id.* at1508. Moreover, if a court supportably finds that a defendant "*actually believed* that no substantial risk was created under the circumstances, a finding of knowledge would not be warranted." *Id.* (emphasis added).

### 3.    Probation's Argument

Probation attempts to support its argument by asserting: (1) a co-defendant (Shawn Sandler) set the fire in the first floor of the building by cutting through PVC piping on the second floor where apartments were located; (2) the defendant had to have knowledge that apartments were located in the same building housing Doug's Discounts, and (3) the defendant had to have knowledge of the requisite risk because his intent was to destroy Doug's Discounts. PSR ¶ 39.

First, there is no evidence the defendant had any knowledge how Sandler was going to proceed. Probation's second assertion is speculative but not challenged for the

reasons stated below.  Its third assertion is unsupported by facts sufficient to establish such a conclusion.[2]

### 4.    **Actual Facts**

The object of the July 23, 2003 fire alleged in Count 2 (Group 2) was well-protected against a fire that would present a substantial risk to the second floor apartments for two reasons.  First, for fire suppression, it had an up-to-date, working sprinkler system.  (*See* Attachment 2 and Exhibits A-D, annexed thereto).  Second, for fire separation, it was surrounded by the *required* one hour fire separation barrier of 5/8" sheetrock on the walls and ceilings.  *See id.*  The defendant knew these protections were in place and actually believed there was no substantial risk.  (*See* Attachment 3).[3]  Further, the defendant's intent was not to destroy this particular store.  His intent with this location was to harry and harass.  *See id.*[4]  The defendant's intent and expectations are proven by the actual damage to the building – in contrast to the impression created by ¶ 17 of the PSR.   The estimated repair costs were $2800 for the building and $3500 for

---

[2] As set forth below and in Attachments 2 and 3, the defendant believed Doug's Discount could not be destroyed because of both the store's sprinkler system and one-hour firewall.  Defendant's intent by this time was to harass.

In the Addendum to the PSR, Probation asserts that a base offense level of 24 is also proper under § 2K1.4(a)(1)(B) because the "offense involved the destruction or attempted destruction of dwellings."  PSR at 32.  Respectfully, there is no evidence whatsoever that Leccese (or even Sandler for that matter) attempted to destroy the dwellings.  At worst, the fire in question "endangered" the apartments.  In *Ruiz*, the First Circuit made clear that the 4-point enhancement is not triggered if dwellings are merely endangered by a fire, but rather only if defendant was attempting to destroy the dwellings themselves.  105 F.3d at 1505.  The requisite *mens rea* is simply lacking here.

[3] Due to logistical issues, the copy of Attachment 3 (defendant's Affidavit) attached to the sentencing memorandum has not yet been signed.  The undersigned have thoroughly discussed its content with defendant, who is custody, to ensure its truthfulness.  As set forth in defendant's motion being filed simultaneously herewith, the undersigned intend to submit a signed copy of this Affidavit to the Court at or before the sentencing hearing.

[4] The intent of co-defendant, Sandler, who set the fire, is another thing.  (The transcript of his sentencing is annexed hereto as Attachment 4).

the adjacent McDonalds according to permit applications to the City of Chelsea.[5]  Most

important, the fire was not sufficient to even trigger the sprinkler system. (Attachment 2).

Accordingly, § 2K1.4(a)(1)(A) should not be utilized nor its 4 level enhancement

of the Base Offense Level applied.[6]

### C.    Relevant Factors Under 18 U.S.C. § 3553(a)

#### 1.    Standards

In the aftermath of *United States v. Booker*, the Guidelines are no longer the sole

sentencing consideration.  Pursuant to *Booker*, the Court should consider what type and

length of sentence is sufficient, but not greater than necessary, to comply with the

statutory directives or purposes set forth in 18 U.S.C. § 3553(a).  Those purposes, as set

forth in 18 U.S.C. § 3553(a)(2) are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider: (1) the nature and

circumstances of the offense; (2) the history and characteristics of the defendant; (3) the

kinds of sentences available; (4) the need to avoid unwanted sentencing disparity among

---

[5] However, there may have been some collateral damage, such as to contents, and the defendant accepts full responsibility for the fire regardless of the manner in which the Court resolves this issue.

[6] The guideline calculation would then be as follows: Each of the three counts would have a Base Offense Level of 20; a two point adjustment would be added for role in the offense – the defendant withdraws his initial objection; calculations pursuant to U.S.S.G § 3D1.4 would add three levels for a Combined Adjusted Offense Level of 25; three levels would be subtracted for acceptance of responsibility yielding a Total Offense Level of 22.  His CHC is I, which again yields a range of 41-51 months.

Should the Court, however, choose to adopt the Guidelines range set forth in the PSR, it should start its downward departure from the low-end of that range (63 months).  This is appropriate, because both Mr. Muniz and Mr. Sandler – against whom Mr. Leccese cooperated – were sentenced at the lowest end of their respective Guidelines ranges for the fires also at issue here.

defendants with similar records who have been found guilty of similar conduct; and (5) the need to provide restitution to any victims of the offense.  To the extent anything in § 3553(a) conflicts with the Guidelines, it is important to remember that the Guidelines are merely advisory.  *Booker*, 125 S. Ct. at 764.[7]

## 2.     <u>Leccese is Unlikely to Recidivate</u>

As set forth above, one of the enumerated factors for the Court to consider under 18 U.S.C. § 3553(a) is the need to "protect the public from further crimes of the defendant."  Expert studies demonstrate that individuals with no prior criminal history, like Leccese, are also the least likely to recidivate.  *See, e.g., Recidivism and the "First Offender": A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission (May 2004), http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf.  This study looked at the recidivism rates of various groups of federal defendants who were generally classified as "first time offenders."  The Commission found that offenders like Leccese who "have had no recorded contact with the criminal justice system prior to their instant federal offense," "are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend," "as indicated by their extremely low recidivism rate of 6.8 percent."  *Id.* at 17.  Further, "[e]ven among offenders with zero criminal history points,

---

[7]  For example, the defendant's age, his education and vocational skills, his mental and emotional condition, his physical condition including drug or alcohol dependence, his employment record, his family ties and responsibilities, his socio-economic status, his civic and military contributions and his lack of guidance as a youth may all be considered. 18 U.S.C. § 3661 (providing no limitation shall be placed on the information concerning the background and character of the defendant).  *But see* U.S.S.G. § 5H.  Further, § 3553(a)(2)(D) requires a sentencing court to evaluate the need to provide the defendant with education, training, treatment or medical care in the most effective manner; this directive arguably conflicts with the guidelines, which in most cases offer only prison.  *See* U.S.S.G. § 5C1.1.  Lastly, § 3553(a)(7) directs courts to consider "the need to provide restitution to any victims of the offense."  In certain cases, imposing a non-custodial sentence or only a short period of imprisonment will best accomplish this goal by allowing the defendant to work and pay back the victim.  The guidelines have no provision for this alternative.  Where there is a conflict between factors set forth in § 3553(a) and the guidelines, the courts determine the resolution.

offenders who have never been arrested [like Leccese] have the lowest recidivism rate of all." *Id.*

### 3.    Leccese Promptly and Fully Accepted Responsibility

Very soon after his arrest, Leccese accepted responsibility for his crimes and began cooperating with the government. He demonstrated his significant level of acceptance by explicitly waiving his right to a hearing on remaining free – upon entry of his change of plea in January 2005 – pursuant to 18 U.S.C. § 3145(c). This waiver was especially meaningful here, where, based on the government's standard position not to sentence a cooperator until his cooperation is complete, Leccese effectively agreed to be placed in custody until resolution of the cases involving the two individuals against whom he cooperated. Although both individuals have since plead guilty (no doubt due in large part to Leccese's cooperation), at the time Leccese did not know whether their cases would end only after lengthy pretrial proceedings and a trial. Thus, in light of the fact that he believes his Guidelines range is 41-51 months and the government had agreed to file a downward departure motion pursuant to both U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), there was a very real chance that Leccese could have served more time than his ultimate sentence. This was a risk he was willing to take based on his desire to accept responsibility for his wrongdoing.

### 4.    Leccese's Cooperation Resulted in Convictions Against Two Repeat Offenders, Including a Career Offender

Leccese's cooperation in this matter has yielded meaningful results for the government. Specifically, his cooperation was a significant contributing factor in two convictions secured by the government. Most notably, in the case *United States v. Sandler*, 04-10148-RCL (D. Mass.), defendant Shawn Sandler – a dangerous and violent

career offender – plead guilty in large part due to information that Leccese provided to the government. At sentencing in that matter, the government acknowledged Sandler's "seamless history of criminal conduct" over the past 20 years, including his shooting of a security guard, and noted an "escalation in potential dangerousness of the conduct." (Attachment 4 at 23). The government further described Sandler as follows: "When I say a true career offender, not just a career offender in the literal [sense] of the guidelines, but a true career offender, somebody who has amassed 20 criminal history points in the course of their career. As the Court is well aware that under the guidelines you reach the highest criminal history when you reach 13 points. Well, at 20 points Mr. Sandler would easily be a nine or a ten if they went up that far." (Attachment 4 at 27).

### 5. Leccese Has Already Begun Repaying the Victims of His Wrongdoing

Unfortunately, Leccese does not have sufficient money to make whole everyone who was financially harmed by the fire. He fully recognizes and accepts, however, that he is the sole source of potential restitution, as Mr. Muniz and Mr. Sandler have no assets. To this end, although he is already incarcerated, he has started the restitution process. In fact, through his civil attorneys (not the undersigned), Leccese has provided partial restitution and settled with every insurance company that paid out a claim in relation to the fires that has sought payment from him.

### 6. Ability to Pay Further Restitution

The Court will undoubtedly order further restitution in this case. Based in large part on the restitution payments he has already made, and the fact that he has been incarcerated for nearly two years, as a practical matter Leccese will not be able to start making Court-ordered payments until release. Moreover, it is likely that the longer the

period of incarceration, the more difficult it will be for him to earn money and continue the restitution process. See *United States v. Blackburn*, 105 F.Supp.2d 1067, 1068 (D.S.D. 2000) (imprisonment counter-productive toward ability to make required payments).

### III.    <u>CONCLUSION</u>

For all of the foregoing reasons, Leccese respectfully requests that the Court sentence him to a term of imprisonment below the applicable Guidelines range.

Respectfully submitted,


/s/ Thomas M. Hoopes
Thomas M. Hoopes (BBO No. 239340)
Douglas S. Brooks (BBO No. 636697)
KELLY, LIBBY & HOOPES, P.C.
175 Federal Street
Boston, MA 02110
(617) 338-9300


Dated:   January 15, 2007


### <u>CERTIFICATE OF SERVICE</u>

I, Douglas S. Brooks, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent by regular mail on January 15, 2007 to those, if any, indicated as non-registered participants.


/s/ Douglas S. Brooks
Douglas S. Brooks

# ATTACHMENT 1



**D'Amico & Associates**
473 Broadway
Chelsea, Massachusetts 02150
Office (617) 889-2020
Fax (617) 889-2301

December 16, 2004

To Whom It May Concern:

I am pleased to provide this character reverence for Mr. Todd Leccese.

I have had the privilege of working for Todd in my capacity as a realtor and business owner on numerous occasions. He has always treated my employees and myself with the utmost respect.

I have also known Todd on a personal level from a boy playing little league baseball to becoming a young man. I have also been a witness to the kind acts he's performed for others.

I sincerely wish him good luck at this time and in his future.

Very truly yours,

James D'Amico
Century 21 D'Amico

*Each Office Is Independently Owned And Operated*



**Do-Awl**
*Construction Co., Inc.*

**Family Owned**

**Licensed & Insured**                                    **Commercial & Residential**

**MARCH 8, 2005**

**TO WHOM IT MAY CONCERN:**

**IT IS WITH GREAT CONFIDENCE THAT I OFFER THIS CHARACTER REFERENCE FOR TODD LECCESE. I HAVE KNOWN TODD FOR 25 YEARS AND DURING THAT TIME I HAVE FOUND HIM TO BE A FINE YOUNG MAN WITH MANY POSITIVE QUALITIES.**

**MOST OF MY INTERACTION WITH TODD HAS BEEN ON A SOCIAL LEVEL BECAUSE OUR FAMILIES HAVE BEEN CLOSE. HOWEVER, I HAVE ALSO HAD THE OPPORTUNITY TO ENGAGE WITH TODD ON A PROFESSIONAL BASIS, AS MY BUSINESS NEEDS REQUIRED. IN EACH AND EVERY SITUATION, TODD HAS PROVEN TO BE KIND, COURTEOUS AND RESPECTFUL. HE HAS CONTINUALLY DISPLAYED THE TYPE OF ATTRIBUTES THAT WILL SERVE SOCIETY WELL AS HE CONTINUES TO GROW AND DEVELOP.**

**I AM QUITE CERTAIN THAT TODD IS WORTHY OF EVERY CONSIDERATION YOU MAY SHOW HIM AND IT IS WITHOUT HESITATION THAT I REQUEST YOUR THOUGHTFUL REVIEW OF HIM.**

**SINCERELY,**

*Karen M Giardullo*
**KAREN M. GIARDULLO**

*Frank L. Giardullo*
**FRANK L. GIARDULLO**

**25 Stillings Road, Saugus, Massachusetts 01906**

**Phone: (781) 233-1029**                              **Fax: (781) 233-9633**

*Over 4 Generations of Quality, Craftsmanship & Confidence*

Tanya Gioldasis
175 Main Street
Epping, NH 03042

Dear Judge Wolfe:

My name is Tanya Gioldasis and I'm Todd Leccese's sister. I received my bachelor degree from Salem State College in social work. I am a wife and mother of an eighteen month old baby girl. Never did I think that neither my family nor I would be in a position of writing a letter of this nature, especially pertaining to my brother. I write this letter to you with a heavy heart.

Todd and I share a unique bond, we are twins. It must have been our innate differences that made our relationship so easy and close. Todd's disposition quiet, safe and bashful and I the talkative, outgoing, and precocious one. Our love for one another started long before my memories exist. There has not been a single memory in my childhood or adolences where it was not the two of us.

Todd has always been a great source of guidance and strength for me personally, and my entire family. From the moment our father left, it was Todd who sustained our family. He was the glue that held our family together. Our tight knit family looked forward celebrating holidays, birthdays, and our weekend barbeques were a source of enjoyment and closeness. Todd never missed an opportunity to be around his family, but more importantly, was the time spent with his small nieces and nephew.

He has always been a loving son, the best brother a girl could have, a playful uncle, and as a man, I always viewed Todd as a high quality person and someone to be proud of. He has always been thoughtful and generous to all in need. He once purchased a computer for a friend when he unexpectedly lost his leg, which prohibited him from working. The computer allowed John to work from home and remain financially independent. Todd never looked for a thank you or pat on the back when helpful.

Now, we are forced to be apart, how painful the distance feels, an indescribable emptiness that only a twin may understand. Lastly, I would like to convey to you how sorry, embarrassed and remorseful Todd is by his actions. I know his actions would never be repeated, and here we are as his family, faced with his absence, the loss enormous and inexpressible. So please, if there is anyway to reduce the severity of his sentence I ask you your Honor, please consider all that I have said, and know just how sorry we all are, especially Todd. Thank you for taking the time to read my letter expressing my thoughts, feelings, and relationship between me and my brother.

Sincerely,

*Tanya Gioldasis*

Tanya Gioldasis

February 7, 2005

Dear Judge,

I am writing today on behalf of Todd Leccese.
My name is Nicholas Hartt. I am a retired police officer since 2002 after
serving over 25 years in the town of Saugus, Massachusetts, retiring at the rank
of lieutenant. I then worked as a court security officer under the U.S.Marshals
for 19 months, splitting time between the Moakley court house and the bankruptcy
court at the Tip O'Neil building.
 I also served in the United States Marine Corps in 1968-69, serving a short
term in Viet Nam before being injured there, receiving a purple heart.
I have known Todd and his family since 1984. My wife and Todd's mother are
cousins. During that time I watched Todd as he grew from a boy to a man. I
attended family functions where Todd and his family were present. I watched Todd
play Little League baseball, Babe Ruth and football with my nephews as he
matured into a young man. Todd was always respectful, courteous and thoughtful
of others. He was the type of person you hoped your own children would develop
into.
In my professional capacity as a police officer in the town where Todd lived I
am not aware of any incidents that involved Todd, criminal or mischievous. In my
opinion Todd was a model teenager and young adult.
I am not writing today to defend Todd for the actions that put him before you
today. I am writing to appeal to your sense of compassion as you pass sentence
on Todd. I believe in my heart that Todd is every bit the good person he was
growing up and that any mistakes he made has not diminished the good qualities
of a person he is.
I ask for compassion in sentencing for his family who has done no wrong. They
are a good and loving family and Todd has caused heart break and grief for which
he must bear the burden for the rest of his life.
Your Honor, I thank for your time and consideration as you perform your
extremely difficult duty.

                                    Respectfully yours,

                                    Nicholas Q. Hartt
                                    4 Ashby Street
                                    Saugus, MA
                                    01906
                                    Phone 781-231-5705

**Daniel P. Katsarakes**
**189 Lynn Shore Drive**
**Lynn, Massachusetts 01902**
**(781) 592-8093**

June 15, 2005

To whom it may concern:

I would like to express my support for Mr. Todd Leccese as a conscientious and principled young man whom I have had the privilege of being associated with for several years.  As a Superior Court Officer, I have first hand knowledge of Mr. Leccese's  upbringing, personal development and current standing as an outstanding entrepreneur and citizen.

I would be happy to provide any additional information if required.

Sincerely yours,

Daniel P. Katsarakes

DIANE LECCESE
6 Gilway Street
Saugus, MA 01906

February 11, 2005

To The Honorable Judge,

My name is Diane Leccese and I am Todd Leccese's mother.  I am writing you this letter because I would just like you to know a side of him that you can not see as he stands in front of you.

Todd is one of three children.  He has an older sister Lisa and a twin sister Tanya.  Growing up in Saugus he was involved in all kinds of sports and community events.  He was never in any kind of trouble.  This is so out of character for him.

After graduating from Saugus High School he went on to Dean College where he earned an associate degree in business.  While Todd was still in college I went thru a divorce, after 27 years of marriage, and two bouts of cancer.  Todd was my Rock of Gibraltar.  I relied on him for everything, emotionally and financially, maybe a little too much.  As a teenager he had the role of husband, father, son, grandson and brother to all of us.

Todd has a heart of gold especially to people that are less fortunate.  At Christmas he would donate hundreds of toys and food to St. Rose's church in Chelsea.  Always ready to help everyone with no questions asked.

We all recognize the seriousness of the offence.  I know Todd feels terrible remorse for what he has done and that the wrongful behavior will never be repeated.  The thought of losing my only son is devastating and sometimes unbearable.  Me and my family are just heart broken.

Your Honor, please I am begging you to consider all the good in Todd.  Please have some leniency and look at the impact that his sentence will have not only on Todd but also his entire family.  Your Honor, thank you for your time and for reading my letter.  I'm not proud of what Todd did but I will always be proud to call him my son.

Respectfully Yours,

Diane Leccese

Diane Leccese

February 26, 2005

To The Honorable Judge Mark L. Wolfe,

My name is Fred Leccese and I am writing this letter about my son with great pride and deep sadness in my heart. I would like you to know a little about Todd and some of the people that touch his life. He is extremely close to his mother, two sisters, grandmother, three nieces and nephew.

I was very proud of Todd when he graduated from Dean College in Franklin, MA. At that time his mother and I were going through a divorce. He would come home every weekend to make sure his family were okay.

For thirty-one years, I have watched him interacting with family, friends, city officials and business associates. Anyone that knows Todd marvels at the amount of hours he works.

For most of his adult life, he has worked in the family business and real estate business. At Thanksgiving and Christmas he would personally hand out fruit baskets and turkeys to all of them. If they needed extra money to make ends meet, he always had his hand in his pocket to give.

I hope and pray that you can look upon my son with merit, worthiness, and his ability to help the community. Please try and find a way that some goodness can come from this, not all sadness.

Todd has shown great remorse. Help him payback, outside with his family. Please don't take years from his young life.

Sincerely.

*Fred Leccese*

Fred Leccese

27 Juniper Drive
Saugus, MA 01906
January 17, 2005

To Whom It May Concern:

I am writing on behalf of Todd Leccese. I am an elementary school teacher and while teaching Kindergarten I had Todd and his twin sister Tanya in my class in 1978. He was a hard worker and was always eager to please the other children and teachers alike. That trait followed Todd. My son Chris and Todd were classmates and were involved in many youth activities together including Little League Baseball, Pop Warner Football, Babe Ruth Baseball, as well as high school football and baseball. While following all of these activities I got to know Todd on a personal basis. I found that he was a person you could always rely on, a real "team player"

Todd comes from a wonderful, close, caring family. He has never given them any reason to worry. After his parents' divorce he would always check on his mother's well being and be available to help her and the family in any way he could. This entire episode has devastated the family. They have suffered greatly. Knowing he may be going away for several years is extremely difficult to endure. I am asking the court to consider Todd's family when making its decision. You will not only be sentencing Todd, but also his mother, two sisters and three adorable nieces and a nephew who love their uncle very much.

Sincerely,

*Annette Mikulski*

Annette Mikulski

**Mr. Peter Milano**
**18 Zito Drive**
**Saugus, MA 01906**

March 7, 2005

The Honorable Mark L. Wolf
United States District Judge
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

      **Re:    Todd Leccese**

Dear Judge Wolf:

      I write this letter on behalf of Todd Leccese. It is my sincere hope that this letter will give you a more complete picture of Todd before you impose sentence upon him.

      I am currently the Special Counsel to the General Counsel at the Central Artery/Tunnel Project ("the Big Dig"). Prior to this position, I was Chief Administrative Judge and/or Chief Counsel for the Massachusetts Highway Department for 25 years. In addition to my job with the Big Dig, I am President of the East Boston Salesians Boys and Girls Club.

      Todd Leccese is my cousin. I understand that he has pled guilty to serious criminal charges. It is not the intent of this letter to make excuses for Todd as it relates to his conduct at issue in the case. However, I think it is important for you to know that this represents completely aberrant behavior on Todd's part.

      I have known Todd for his entire life. During those thirty plus years, I have never observed or heard about him doing anything that caused harm to others – much less committing a criminal act.

      Todd is also extremely hard working. Despite his young age, he built and ran several very successful – and legitimate – local businesses, from the ground up.

      Without question, Todd made a serious mistake. I know that more than anything, he wishes that he could undo all that he has done. While of course this is impossible,

Todd has fully and promptly accepted responsibility for his actions and is looking to put this unfortunate chapter of his life behind him. I understand that some punishment is warranted in this case. However, I also know that Todd has the ability to make many positive contributions to society upon his release. I honestly feel that the interests of society are best served by Todd being out of prison. Accordingly, I hope that you will take all of the above into consideration when you determine the appropriate sentence for Todd.

       Thank you for your thoughtful consideration.

                        Very truly yours,

                        Peter Milano

February 9, 2005

To Whom It May Concern:

I am writing on behalf of Todd Leccese. I have lived next door to Todd's family his entire life. Todd spent a huge amount of time at my house playing with my nieces and nephews who are the same age as he. Todd was always a very thoughtful, courteous and respectful young boy. This followed him into adulthood.

Todd was raised in a very close, loving family. After his parents divorce, Todd did everything he could to help his mother through a very difficult time. He is always at her home doing all the maintenance around the house, such as cutting the lawn, shoveling snow, etc. He also helps many of the elderly neighbors on the block. He is always willing to lend a helping hand and pitching in whenever needed.

Todd has never been in any trouble before. It goes without saying that his family is going through a very emotional and difficult time. The thought of losing Todd for several years has devastated them all. I hope that you will take into consideration all the good Todd has done in the past when making your decision for his future.

Sincerely,

Rosalie Milano

Rosalie Milano
233 Lynn Fells Parkway
Saugus, MA  01906

Mrs. Lisa M. Morgante
Seven Gilway
Saugus, MA 01906

March 1, 2005

Dear Honorable Judge Wolfe:

My name is Lisa Morgante. I am the oldest of three children from Frederick and Diane Leccese and sister to Todd Leccese.

Todd was a sensitive and gentle child with a shy smile. Throughout his adolescence he was a model son and brother, an ideal high school student and serious undergraduate at Dean College. Todd is a diligent, hard worker who always made time for his family. He has always been a person I was proud of and as a man, his shy smile remained.

Todd is my only brother and godfather to my first born child. He was my infant daughter's first babysitter when I was faced with leaving her for the first time. He is the one I trusted completely and the uncle who so proudly doted on his newborn niece, he enthusiastically accepted. I was relieved whenever she was in his care.

During my parents painful divorce, Todd, just eighteen, fell into the roll of "man of the house" taking care of the responsibilities left undone in the absence of our father…shoveling, mowing the lawn and the general upkeep of our house. But most importantly, it was both the comfort and emotional support he provided the three women in his life; his mother and two sisters. Still, after leaving home and moving on with his adult life, he returned weekly to carry out the household responsibilities he so willingly took on. It saddened us all on our first snowfall without Todd. No sound of his plow, no walk shoveled before we woke. A sober reminder of his absence, as will all the firsts without him; birthdays, holidays and all the days in between.

It is heartbreaking to accept the time I will be forced to be apart from my little brother. It has been unbearable witnessing the devastating effect this has had on my Mother, and he, her only son. Todd's small nieces and nephew will grow out of their childhoods without his gentle guidance, love and support. In turn, he will be incapable of witnessing their growth and many accomplishments.

I, as well as my family, understand the severity and seriousness of the charges my brother is facing. But if there is anyway to diminish the harshness of his sentencing, please take into consideration that he has had no prior record and up until this point, has been a model citizen. My family is heartbroken by his recent imprisonment and begs for your leniency during his sentencing.

I would now like to thank you for your time and consideration in this matter.

With much sincerity,

Lisa M. Morgante

December 29, 2004

To Whom It May Concern:

I am writing this letter in behalf of my nephew Todd Leccese. I have known Todd since the day he was born and have been very close to him all his life.

I have never known Todd to be in any trouble or cause his family any problems while he was growing up. He is a very caring, loving and giving person and generous to a fault.

Last year Todd donated toys to St. Rose's Church in Chelsea for 600 families. Todd has always given freely of his time to his family, friends and neighbors. During snow storms he used his truck to plow out all his family, friends and neighbors on Gilway, the street where he grew up in Saugus, without being asked or without remuneration.

I know Todd made a mistake, a costly one to be sure, but I am hoping he will be given a chance to prove himself as the good citizen and caring person that I know he is.

Sincerely,

Gloria Mucci

Gloria Mucci

SALVATORE V. MUCCI
1008 PARADISE ROAD
SWAMPSCOTT, MA  01907
781-592-1574

December 27, 2004

To The Honorable Judge

I have known Todd Leccese since he was born, he is my first cousin's son. I have seen him grow up in such a caring, wonderful family – with his sister Lisa and his twin sister Tanya – and develop into quite an accomplished young man who has never been in any kind of trouble before.

He played many different sports at Saugus high school and played football in college. He was always a team player who was driven to do his best.

After college he worked for his father and then branched out on his own and bought real estate.  Through hard work and determination he became very successful and was beginning to become a very important part of the community.  He helped Saint Rose's Parish in Chelsea by donating food, clothing, toys, household furnishings and money so that many (from what I have heard –600) families would not be forgotten at Christmastime.

Todd is a doting grandson, brother and uncle to his grandmother, sisters, nieces and nephew, but he is especially a loving, caring and giving son to his mother, Diane.  He stood by her through divorce and breast cancer.  He has not only helped her financially, but has helped her emotionally as well.  The situation that Todd now finds himself in is devastating to himself and his family.

I know that Todd is truly sorry for what has happened and is very remorseful for his actions and am sure that when he looks back on this situation – because of the way he was raised to respect life and property – he wonders how he ever could have made it happen.

Your Honor, I am asking that you take these thoughts into account now – Todd has never been in trouble before, has always tried to do his best, has always been a hard worker, has been a generous man in the community and a wonderful family man especially to his mother.  Todd is deeply saddened by his actions especially in light of the way he was raised.

Sincerely,

Salvatore V. Mucci

 **CITIZENS BANK**

Citizens Bank of Massachusetts
28 State Street
Boston, MA 02109
617 725-5500

December 24, 2004

To Whom It May Concern:

I have known Todd Leccese for many years.  He has always been a hard-working, loyal and caring person.

In the freezing cold, Todd came and helped me get my car started and also had the problem fixed.  He has always made himself available to his family, friends and those less fortunate.  He is a loving son and a great brother to his two sisters.

I have never known Todd to get into trouble with the law, in fact, he always avoided associating with the rough crowd.

I hope that all the good that is inside Todd is taken into consideration.

Sincerely,

Rita M. O'Brien
Branch Manager

Daniel Prezioso
5 Jones Drive
Saugus, Ma. 01906

Dear Sir,

We have known Todd Leccese all his life. He has a caring, loving family that is heart broken over his misjudgment. Todd was always a good person, a kind a kind person. He was never in trouble and always looked out for his buddies. He played sports with our son. He was always a team player with a lot of heart. Our son had an unfortunate accident, which resulted in the loss of his leg. During his long recovery, Todd was a frequent visitor and a supportive friend.

We pray you'll consider our plea for leniency when judging him.

Very truly your,

Daniel and Cynthia Prezioso

John Prezioso
105 Blueberry Road
Waterboro, Me. 04037

To Whom it may Concern,

Todd Leccese is my life long friend. He is a good stand up guy and a caring friend. We went to school together and played baseball. He is always someone you can rely on through thick and thin. He is not the kind of person who gets in trouble. This is out of character for him to be involved with the police or any thing illegal. He was very supportive to me and my family when I had an accident a few years ago. He "ll always be my friend.

Any leniency you can show Todd will be greatly appreciated.

Yours truly,

John Prezioso



222 Rosewood Drive Danvers, MA 01923
Tel 978 646-3052    Fax 978 646-9240
mscire@metlife.com

**Marsha A. Scire**, LUTCF
Financial Services Representative
Associate Financial Planner

Leaders Conference
Member, NAIFA
Registered Representative

**❖MetLife® Financial Services**

To Whom It May Concern,

I have known Todd Lecesse of Saugus, Ma. for most of his life, as well as his parents and grandparents. He comes from a wonderful family who is well respected in our community.

Todd, who grew up with my son, was very involved with sports and was always well liked and got along with everyone. As he grew he was very ambitious and hard working. To this day he is a very likable and respectable person. He has a close relationship to his family, especially his elderly grandmother, his mother, two sisters and nieces and nephew.

I would ask that you have some leniency and look at the impact that his sentence will have not only on Todd but also his entire family.

Sincerely,

*Marsha A Scire*

Marsha A. Scire LUTCF, CLTC
Financial Services Representative
Associate Financial Planner

December 28, 2004

Life insurance and annuities offered by Metropolitan Life Insurance Company, New York, NY 10010.
Investment Advisory Services and mutual funds offered by MetLife Securities, Inc., New York, NY 10010.

# East Boston Savings Bank®

*150 Years of Leadership*

December 16, 2004

To Whom It May Concern:

I am writing this letter as a character reference for Todd Leccese. I have known Todd all of his life. I am his Godmother and second cousin.

Todd's mother, Diane, stayed at home to care for her children, Todd and his twin sister Tanya and his older sister Lisa. Todd's maternal grandparents lived just across the street, and Todd still has a close and loving relationship with his grandmother Marguerite Milano. Also on the same street were several other relatives on his mother's side of the family.

Todd played football at Saugus High. He is a little on the shy side and not one to brag about himself. He was popular and had many friends, who were always at his home.

Until he moved out on his own as a grown-up, Todd lived in the same house on Gilway in Saugus in the midst of his family, friends and neighbors. Todd is a loving, respectful son, grandson, brother and uncle. He has three nieces and one nephew, whom he dotes on. He is always there for his family and is the type of man who will go the extra mile to help a friend if he can.

I hope this brief letter tells you a little about Todd. He is a caring man, family oriented and I am proud to have him as a Godson and cousin.

Sincerely,

*Carol A. Simpson*

Carol A. Simpson,
Vice President, Retail Branch Administration
East Boston Savings Bank



# BOSTON COLLEGE

PHILOSOPHY DEPARTMENT

To whom it may concern:

I am a Jesuit priest, a professor of philosophy here at Boston College, and a cousin to Todd Leccese, whose mother, Diane, I have known since childhood. When I first learned what Todd had involved himself in I was deeply shocked. Never—ever—had I known him to be engaged in anything illegal. Just the opposite. He was a man who acted with kindness, generosity, and uprightness. Todd, I know, is deeply remorseful, and is aware what tragic repercussions his actions have had on others, including his own family. I would respectfully ask that, when he is being judged, this other and very real side to him be taken fully into account. With thanks in advance, I am

Sincerely,

*R K Tacelli.*

Ronald K. Tacelli, SJ

12 Dec. '04

PS: If I can be of further help, please do not hesitate to contact me.

< TACELLI @ BC.EDU >

617/ 552- 8138

**Joseph Zito**
**5 Gilway Road**
**Saugus, Massachusetts 01906**
**(781) 233-2746**

December 16, 2004

To Whom It May Concern:

    I have known Todd Leccese all of his life.  Growing up, Todd was always very well-behaved and never got into any trouble.  As he became older, he was a very hard working man and very dedicated and serious about achieving success at whatever he did.  I used to tell him to slow down since he was working too hard for a young guy and to go out and enjoy himself.

    I was very surprised and upset to hear the charges that were brought against him.  I know when he started working in Chelsea he started making new friends in that area and must have gotten mixed up with the wrong crowd.  I know Todd and this was not like him in any way.  Todd was always there to give someone a helping hand and never wanted anything in return.

Very truly yours,

Joseph Zito
Cousin, Neighbor and Friend

# ATTACHMENT 2

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA ) Case No.: No. 04-CR-10366-MLW
 )
   v. )
 )
 )
TODD LECCESE )
 )
   Defendant )
 )
 )
_____ )

## **AFFIDAVIT OF THOMAS M. HOOPES, ESQ.**

I, Thomas M. Hoopes, Esq. do state on oath as follows:

1. I am co-counsel of record for the above-named defendant.

2. I have received certain materials from a privately-retained building inspector,

Harry F. Smith.

3. The materials are attached hereto.

Signed under the penalties of perjury this _15_ day of _January_ _2007_ .

        _____
        THOMAS M. HOOPES, ESQ.

# EXHIBIT 2A

# *H. F. Smith & Associates*
## *Building Inspection & Consulting Services*

203 Pond Street, Weymouth, MA  02190
Tel: (781) 337-3443  Fax: (781) 340-7330
E-mail:  hfsmith2001@comcast.net

11/19/2005

Attorney Thomas Hoopes
Kelly, Libby & Hoopes, P.C.
175 Federal Street
Boston, MA  02110

**RE:    472 Broadway**
       **Chelsea, MA**

Dear Attorney Hoopes,

At your request the following services were performed on your behalf:
1.  A review of 780CMR, 6th Edition (Mass. State Building Code), as it applied to the referenced property.
2.  On Nov. 18, 2005, records on file regarding the referenced property were reviewed at the Chelsea Inspectional Services Dept., Chelsea, MA.
3.  A limited visual inspection of the referenced property was also conducted on Nov. 18, 2005.

**Summary Report**

Fire Separation:
The building code review revealed that a one hour fire separation is required in buildings of mixed use.
A one hour fire separation is generally defined as the time that it would take for fire to burn through a building assembly, such as a ceiling, and allow safe passage of an occupant on the other side of the fire rated assembly.  A one hour fire separation can be achieved in a number of ways, including 5/8" gypsum wall board.
The records on file revealed that the renovation of 2002 included 5/8" sheetrock on the walls and ceilings.
The Director of Chelsea Inspectional Services, Joseph Cooney, confirmed that this had been complied with.
The limited inspection of the retail portion of the building, while not confirming the thickness of the wall and ceiling coverings, revealed that it did appear to be in compliance with the codes, as Mr Cooney had indicated.

Fire Suppression:
The limited inspection of the retail area of the building confirmed that a sprinkler system was in existence.
The building inspector, Joseph Cooney, confirmed that it was in place at the time of the fire.  He further said that it was not activated by the fire and he opined that was probably because the fire was contained before the system was triggered.  He added that was likely because of the minor nature of the fire and the fast response of the very near-by fire department.  Damage was largely to inventory and no major repairs were required, according to Mr. Cooney.

**Overall Comments:**
It appears that the information your client provided to you is true.
For further details, please see the attached main body of the report.

Thank you for selecting our firm to perform your consulting work.  If you have any questions regarding the inspection report or the building, or if I can be of further service, please feel free to call me.

Sincerely,

H.F. SMITH & ASSOCIATES

*H. F. Smith*
HARRY F. SMITH

Member of the American Society of Home Inspectors (ASHI)
Member of the Historic Building Inspectors Association (HBIA)
Member of the Society of Professional Real Estate Inspectors (SPREI)

# H. F. Smith & Associates
## Building Inspection & Consulting Services

203 Pond Street, Weymouth, MA 02190
Tel: (781) 337-3443   Fax: (781) 340-7330
E-mail: hfsmith2001@comcast.net

Chief Inspector

attachment: Inspection Report

Member of the American Society of Home Inspectors (ASHI)
Member of the Historic Building Inspectors Association (HBIA)
Member of the Society of Professional Real Estate Inspectors (SPREI)

472 Broadway, Chelsea, MA

| **Cover Page** |
| --- |

**Inspection Company:**

*H.F. Smith & Associates , 203 Pond Street, Weymouth, MA 02190*
*Tel: 781-337-3443    Fax: 781-340-7330 , email: hfsmith@attbi.com*

**PROPERTY  INSPECTION:**

**Location:**

472 Broadway, Chelsea, MA.

**Report Prepared For:**

Thomas Hoopes, KLH, P.C.

**CONFIDENTIAL:**

*This report is intended for the exclusive use of the person(s) that paid for the
service.  No other person(s) shall use this report, for any purpose, without the
express consent of the person who paid for the service and H. F. Smith &
Associates.*

Copyright ©  2001  H.F. Smith & Associates,  All Rights Reserved

472 Broadway, Chelsea, MA

| GENERAL INFORMATION |
|---|

## CLIENT & SITE INFORMATION:

**DATE OF INSPECTION:**

11-19-2005.

**TIME OF INSPECTION:**

1:00 PM.

**CLIENT NAME:**

Thomas Hoopes, KLH, P.C.

**MAILING ADDRESS:**

175 Federal Street.

**CITY/STATE/ZIP:**

Boston, MA  02110.

**PHONE #:**

617-338-9300.

**FAX #:**

617-338-9911.

**EMAIL ADDRESS:**

thoopes@klhboston.com.

**INSPECTION LOCATION:**

472 Broadway.

**CITY/STATE/ZIP:**

Chelsea, MA.

## BUILDING CHARACTERISTICS:

**BUILDING TYPE:**

Mixed Use: Commercial (retail) on 1st floor, apartments above.

**STORIES:**

2.

## SCOPE OF WORK:

Research applicable sections of the MA State Building Code as it relates to the incident of July 23, 2003.
Research records at the Chelsea Building Dept regarding the fire separation and fire suppression systems (if any) at the referenced property.
Verify the presence of fire separation and suppression systems at the building - *if possible.*
Prepare a report on same.

## OTHER INFORMATION:

**BUILDING OCCUPIED?**

Yes.
On the date of my inspection the retail store was fully operational, doing business as "Doug's Jewelry & Discount Store",
There were approximately 3 to 4 people working there and up to a dozen customers in the store.
There was no apparent evidence of fire damage.

Copyright © 2001 H.F. Smith & Associates, All Rights Reserved

472 Broadway, Chelsea, MA

## COMMENTS:

**DOCUMENTS REVIEWED:**

780CMR, 6th Edition (Mass. State Building Code)
Records for 472 Broadway at the Chelsea Building Dept.

A review of 780CMR, 6th Edition (Mass. State Building Code)  revealed the following:

With a business use (Group B) below and apartment(s) (Group R) above, the building is classified as "mixed use".
780 CMR 313.3 requires a one hour fire resistance rating for the floor/ceiling assembly and the enclosure walls separating the different use groups.

A review of the recent records for 472 Broadway at the Chelsea Building Dept revealed the following.

On 10-15-02 an electrical permit was applied for the installation of a Security alarm system.
On 12-10-02 a building permit was applied for interior renovations.  The permit application and accompanying drawings called for the installation of 5/8" Type X (fire rated) sheetrock on the walls and ceilings of the 1st floor retail area.  The building owner was shown as Apollo Realty.
On 01-09-2003 a permit was applied for the installation of security doors and grates.

There were two (2) permit applications on 07-25-2003 for minimal repairs (Copies of the permit applications are attached).  A summary of the permit applications is as follows:

The first one is permit number: B03/452, Issued on: 7-25-2003.
Address: 474(?) Broadway, Chelsea
Owner: McDonald Corp., 699 Canton St., Westwood, MA Tel: 781-329-1450
Contractor: Marceau Corp., 29 Osgood St. (no city shown) Tel: 978-685-4796
Description: "Repair ceiling from fire damage"
Cost of Const.: $3,500.00

The second one is permit number B03/453, issued on: 7-25-2003. (same date)
Address: 472 Broadway, Chelsea
Owner: Apollo Broadway, LLC, 20 Washington Ave., Chelsea Tel: 617-889-5200
Contractor: Halcyon, Inc/Paul Rugo, 20 Washington Ave, Chelsea
Description: "Repair ceiling from fire"
Cost of Const: $2,800.00

A few observations on my part:
- 474 Broadway appears to be a number arbitrarily assigned to McDonalds to differentiate it from Doug's. In other places they are referred to as 472A and 472B.
- The same issue date of 7-25-2003 may be the date the applications were entered into the computer as opposed to the dates when the applicants actually filed for the permit.
- Apollo Broadway/Halcyon/Paul Rugo appear to be all the same entity.
- Because of the same date and the similar wording in the description of work on both applications - they may have both been taken out by the same person, on the same day. Possibly Paul Rugo.
- The costs shown in each case are minimal, indicating that the damages were minimal.
- Because the applications are computer generated, there are no signatures. The paper originals may no longer exist.
- The damage to the McDonalds was minimal per the structural engineer's report, a copy of which is attached.

_REPORT LIMITATIONS_

Copyright © 2001  H.F. Smith & Associates,  All Rights Reserved

472 Broadway, Chelsea, MA

*The purpose of the inspection and this report was to address the alleged defects and/or code violations Based on the information and documents provided to us, by you or your attorney. The scope of our inspection of the property and this report are limited to the items outlined in those documents. This was not an all encompassing inspection.*

*The report expresses the personal opinions of the inspector, based upon his visual impressions of the conditions that existed at the time of the inspection only. The inspection and report are not intended to be technically exhaustive, or to imply that every component was inspected, or that every possible defect was discovered. No disassembly of equipment, opening of walls, moving of furniture, appliances or stored items, or excavation was performed. All components and conditions which by the nature of their location are concealed, camouflaged or difficult to inspect are excluded from the report.*

*The inspection report should not be construed as a compliance inspection of any governmental or non governmental codes or regulations. The report is not intended to be a warranty or guarantee of the present or future adequacy or performance of the structure, its systems, or their component parts. This report does not constitute any express or implied warranty of merchantability or fitness for use regarding the condition of the property and it should not be relied upon as such. Any opinions expressed regarding adequacy, capacity, or expected life of components are general estimates based on information about similar components and occasional wide variations are to be expected between such estimates and actual experience.*

*We certify that our inspectors have no interest, present or contemplated, in this property or its improvement and no involvement with tradespeople or benefits derived from any sales or improvements. To the best of our knowledge and belief, all statements and information in this report are true and correct.*

*Should any disagreement or dispute arise as a result of this inspection or report, it shall be decided by arbitration and shall be submitted for binding, non-appealable arbitration to the American Arbitration Association in accordance with its Construction Industry Arbitration Rules then obtaining, unless the parties mutually agree otherwise. In the event of a claim, the Client will allow the Inspection Company to inspect the claim prior to any repairs or waive the right to make the claim.*

Copyright © 2001  H.F. Smith & Associates,  All Rights Reserved

472 Broadway, Chelsea, MA

| INTERIOR |
| --- |

**INTERIOR WALLS:**

**MATERIALS:**

> Most of the walls in the retail store were inaccessible for inspection due to the wall rack systems and merchandise that ran almost to the ceiling.
> The areas near the top of the wall that were observable appeared to be drywall.
> Thickness was not determined.

**OBSERVATIONS:**

> Stored items or furnishings prevent full inspection.
> However, the areas that could be observed appeared to be generally in good condition.
> The walls were painted a very dark brown, almost black, color

**CEILINGS:**

**MATERIALS:**

> The ceilings appeared to be drywall.  Thickness was not determined.

**OBSERVATIONS:**

> The ceilings were also painted a very dark brown, almost black, color.
> Generally, the ceilings appeared to be satisfactory.

**COMMENTS:**

> The Director of Chelsea Inspectional Services, Joseph Cooney, indicated to me that both the wall and ceiling materials **DID** meet the requirements of a one hour fire rating as required by 780CMR, the Mass, State Building Code.

472 Broadway, Chelsea, MA

| PLUMBING |
| --- |

### FIRE SUPRESSION SYSTEM:

A fire suppression system in the form of a sprinkler system was noted.
It was an exposed pipe type of system on the ceiling.
<u>NOTE:</u> The testing of the sprinkler systems is beyond the scope of this inspection.



Fire sprinkler piping and sprinkler head

### COMMENTS:

In a conversation with the Director of Inspectional Services, Joseph Cooney, regarding the sprinkler system, he stated that the system did not go off when the fire occurred. He further stated that he believed that it was probably because of the minor intensity of the fire and the fact that the fire department arrived quickly and had the fire under control before the sprinkler system was activated.

Mr. Cooney also stated that damage was largely contained to the inventory and that the damage to the store was relatively minor and mostly cosmetic and the proprietor was up and running again in a very short period of time.

# EXHIBIT 2B

☐ **DUBOIS**
☐ **ENGINEERING**
☐ **ASSOCIATES, INC.**

CONSULTING ENGINEERS                                   STRUCTURAL ○ FORENSIC

July 25, 2003                                                Project #03070

Mr. Edward Bowler
McDonald's Corporation
690 Canton Street
Westwood, MA 02090

RE:    Fire Damage Assessment
       McDonald's
       472 Broadway
       Chelsea, MA

Dear Ed:

At your request, I have examined the fire damage that occurred at the McDonald's Restaurant at 472 Broadway in Chelsea, MA. The request for this inspection was made in an attempt to determine if any structural damage had occurred that would need repair. The following is a summary of my findings based upon this inspection and engineering analysis.

It is my understanding that the fire originated in the adjacent store towards the rear. The fire was localized to a small area and was extinguished quickly by the fire department. There was damage to the fire rated wall that is located between the two spaces. This was mostly due to the water from the fire department. There was a small amount of char on a double 2x12 trimmer to an original skylight opening that had since been framed over. This damage was not enough to decrease the structural integrity of the roof framing in this area and no roof framing repairs are necessary. The remaining framing has been blackened by smoke and not damaged at all.

To repair the damage, it will be necessary to replace any of the fire rated drywall up the wall and around the existing soffit to reestablish the rated membrane. No repairs are required to the roof framing members. Any damaged mechanical and

of restoration the beam strength. No repairs are required to the roof framing otherwise. The damaged electrical systems will have to be repaired as required

If you should have any questions regarding this matter or require additional structural engineering services, please call at your convenience

Sincerely,

Dale A. Dubois, P.E.

Structural Engineer Seal

117 HARRISON STREET. MANCHESTER, NH 03104-3842 ○ (603) 666-0900 ○ FAX (603) 669-0900

# EXHIBIT 2C

**City of Chelsea**
**DEPARTMENT OF INSPECTIONAL SERVICES**
**APPLICATION FOR BUILDING PERMIT**
Joseph F. Cooney, Director

| Date:Year | Date:Month | Date:Week |
|-----------|-----------|-----------|
| 2003 | 7 | 30 |

1. Location    474    Broadway    Map    Zone    Fed. Iden. No.
2. Owner    McDonalds Corporation    Address    690 Canton St. Westwood, MA    Tel. 781-329-1456
3. Tenant/Occupant    McDonalds Rest.    Tel.
4. Special Permit Case #    Date    Variance Case #    Date
5. Date Bldg. Last Occupied, by Whom    Construction Type: wood    Metal    Masonry
6. Lot in Flood Plain    DEQE No.    Lot. Frontage    Rear    Left    Right
7. Setbacks: Front    Rear    Left    Right    Lot Coverage
8. Structure Size:    (Ft.) X    (Ft)    Height    (Ft.) No. of Stories
9. Structure Erected On:    Solid Land    or Filled Land
10. Foundation Erected On: Earth    Rock    Piles
11. Footing Material    Thickness    Width
12. Foundation Material    ckness
13. Garage:    Attached    Detached    Under
14. Insulation Type    R- Value: Walls    Attic    Foundation
15. Type of Heat    Fuel or Power Type
16. Will there be New Plumbing ?    Elec.    Gas
17. Is the Structure Sprinkled ?    Type of Alarm System
18. Contractor    Marceau Corp.    19. Architect
   Address    29 Osgood St.    Address
   Tel.    978-685-4706    License    071191    Tel.    License
20. Home Improvement Contractor Registration No.    Date expired
21. Dig Safe No.    22. Are there Plans accompanied with the application?    Box No.
23. Description of Work to be Done.

Repair ceiling from fire damage

24. Construction Cost    $3,500.00    Value Approved by Bldg Comm    Bldg. Permit Fee    $70.00
25. Workmens Compensation No.
26. Proposed Use for Occupancy. State in Detail of Principal & Accessory Use including Storage

27. No. of Available Parking Spaces    Location
28. No. of Families    Area of Occupied Space    (s.f.) Occupancy Permit Fee

*Permit No.    B03/432    Date Issued    7-25-2003    *Permit No. Ø    / Date Issued

*Permit Type:    Alteration:    132    New Bldg.:    Sign:    Occupancy:

**City of Chelsea**
**DEPARTMENT OF INSPECTIONAL SERVICES**
**APPLICATION FOR BUILDING PERMIT**
Joseph F. Cooney, Director

| Date-Year | Date-Month | Date-Week |
|---|---|---|
| 2003 | 7 | 30 |

1. Location ___471___ Broadway Map _____ Zone _____ Fed Iden. No. _____
2. Owner ___Apollo Broadway, LLC___ Address ___20 Washington Ave. Chelsea___ Tel. ___617-889-5200___
3. Tenant/Occupant _____ Tel. _____
4. Special Permit Case # _____ Date _____ Variance Case # _____ Date _____
5. Date Bldg. Last Occupied, by Whom _____ Construction Type: Wood ___ Metal ___ Masonry ___
6. Lot in Flood Plain _____ DEQE No. _____ Lot Frontage _____ Rear _____ Left _____ Right _____
7. Setbacks: Front _____ Rear _____ Left _____ Right _____ Lot Coverage _____
8. Structure Size: _____ (Ft.) X _____ (Ft.) Height _____ (Ft.) No. of Stories _____
9. Structure Erected On: Solid Land _____ or Filled Land _____
10. Foundation Erected On: Earth _____ Rock _____ Piles _____
11. Footing: Material _____ Thickness _____ Width _____
12. Foundation Material _____ Thickness _____
13. Garage _____ Attached _____ Detached _____ Under _____
14. Insulation Type _____ R-Value: Walls _____ Attic _____ Foundation _____
15. Type of Heat _____ Fuel or Power Type _____
16. Will there be New Plumbing ? _____ Elec. _____ Gas _____
17. Is the Structure Sprinkled ? _____ Type of Alarm System _____
18. Contractor ___Halcyon Inc. Paul Rugo___ 19. Architect _____
    Address ___20 Washington Ave. Chelsea___ Address _____
    Tel. _____ License _____ Tel. _____ License _____
20. Home Improvement Contractor Registration No _____ Date expired _____
21. Dig Safe No. _____ 22. Are there Plans accompanied with the application? _____ Box No. _____
23. Description of Work to be Done.

Repair ceiling from fire

24. Construction Cost ___$2,800.00___ Value Approved by Bldg. Comm. _____ Bldg. Permit Fee ___$35.00___
25. Workmen's Compensation No. _____
26. Proposed Use for Occupancy, State in Detail of Principal & Accessory Use including Storage




27. No. of Available Parking Spaces _____ Location _____
28. No. of Families _____ Area of Occupied Space _____ (s.f.) Occupancy Permit Fee _____

*Permit No. ___B03/452___ Date Issued ___7/25/2003___ *Permit No. _0_ / Date Issued _____

*Permit Type: Alteration: ___Yes___ New Bldg.: _____ Sign: _____ Occupancy: _____

*Commonwealth of Massachusetts*
*Department of Fire Services*
**BOARD OF FIRE PREVENTION REGULATIONS**

OFFICIAL USE ONLY

Permit No _____ 37 4 C 30
Occupancy and Fee Checked _____ 708 U
MEV 11-97    LEAVE BLANK

# APPLICATION FOR PERMIT TO PERFORM ELECTRICAL WORK

All work to be performed in accordance with the Massachusetts Electrical Code (MEC), 527 CMR 12.00

PLEASE PRINT IN INK OR TYPE ALL INFORMATION:

DATE: 7/28/03

City or Town of: Chelsea

*To the Inspector of Wires:*

By this application the undersigned gives notice of his or her intention to perform the electrical work described below.

Location (Street & Number) 474 Broadway

Owner or Tenant Mcdonalds Restrant          Telephone No. _____

Owner's Address _____

Is this permit in conjunction with a building permit?   Yes ☐   No ☐   (Check Appropriate Box)

Purpose of Building _Test Pass ? ? Stamp_

| | | | | | | |
|---|---|---|---|---|---|---|
| Existing Service | Amps | _l_ Volts | Overhead ☐ | Undgrd ☐ | No. of Meters | _____ |
| New Service | Amps | _l_ Volts | Overhead ☐ | Undgrd ☐ | No. of Meters | _____ |

Number of Feeders and Ampacity _____

Location and Nature of Proposed Electrical Work: _Check out wiring for Water_
_and Fire damage._

*Completion of the following table may be waived by the Inspector of Wires.*

| | | | | |
|---|---|---|---|---|
| No. of Recessed Fixtures | No. of Ceil.-Susp. (Paddle) Fans | No. of Transformers | | Total KVA |
| No. of Lighting Outlets | No. of Hot Tubs | Generators | | KVA |
| No. of Lighting Fixtures | Swimming Pool Above grnd. ☐  In- grnd. ☐ | No. of Emergency Lighting Battery Units | | |
| No. of Receptacle Outlets | No. of Oil Burners | FIRE ALARMS | No. of Zones | |
| No. of Switches | No. of Gas Burners | No. of Detection and Initiating Devices | | |
| No. of Ranges | No. of Air Cond.   Total Tons | No. of Alerting Devices | | |
| No. of Waste Disposers | Heat Pump Totals: Number Tons KW | No. of Self-Contained Detection/Alerting Devices | | |
| No. of Dishwashers | Space/Area Heating KW | Local ☐  Municipal Connection ☐  Other ☐ | | |
| No. of Dryers | Heating Appliances KW | Security Systems: No. of Devices or Equivalent | | |
| No. of Water Heaters KW | No. of Signs   No. of Ballasts | Data Wiring: No. of Devices or Equivalent | | |
| No. Hydromassage Bathtubs | No. of Motors   Total HP | Telecommunications Wiring: No. of Devices or Equivalent | | |

OTHER:

*Attach additional detail if desired, or as required by the Inspector of Wires.*

INSURANCE COVERAGE: Unless waived by the owner, no permit for the performance of electrical work may issue unless the licensee provides proof of liability insurance including "completed operation" coverage or its substantial equivalent. The undersigned certifies that such coverage is in force, and has exhibited proof of same to the permit issuing office.

CHECK ONE: INSURANCE ☐   BOND ☐   OTHER ☐ (Specify:) _____   (Expiration Date) _____

Estimated Value of Electrical Work: _____ (When required by municipal policy.)

Work to Start _____   Inspections to be requested in accordance with MEC Rule 10, and upon completion.

# EXHIBIT 2D

December, 2006

## Personal Profile for Harry F. Smith

Beginning in 1978, and after responding to hundreds of requests to perform inspections and provide construction advice, H. F. Smith & Associates was founded in 1991 by Master Builder, Harry F. Smith to provide a variety of Professional Inspectional and Construction Consulting Services.

With an extensive construction background that goes back more than 30 years, his experiences have ranged from residential remodeling to construction of commercial buildings and everything in between, including home building and real estate development.

Along with being a *Licensed Construction Supervisor* for both residential and commercial projects, he also holds a Certification from Northeastern University in Real Estate Inspections and is a *Licensed Home Inspector* in Massachusetts.

Harry was an award winning builder and remodeler, winning the *Remodeler of the Year,* three times, once from the Home Builders Association of Mass and twice from the Builders Assoc. of Greater Boston. He has earned the designation of *Certified Graduate Remodelor* (CGR) and *Graduate Master Builder* (GMB) from the National Association of Homebuilders (NAHB) where he serves as a *National Director* and is also a member of the *Construction Codes & Standards Committee* of NAHB*.*

Harry is a former member of the *Home Improvement Advisory Board* at the state level and was recently appointed by Gov. Romney to serve on the *Board of Building Regulations & Standards* (BBRS) a state board that promulgates the State Building Code, and oversees the Construction Supervisor License program. He also serves on the *State Building Code Appeals Board,* a three man board that is involved in deciding building code issues. Harry is very active with the local chapter of the *American Society of Home Inspectors* (ASHI), where he serves on the education committee. Harry also teaches a certification course for construction supervisors at the *Builders Assoc. of Greater Boston*.

Today, Harry spends much of his time performing commercial building inspections, with a specialty in older, *historic buildings*. He has also been qualified as an *expert witness in the construction & inspectional fields* in numerous court cases and arbitration proceedings where he provides a variety of consulting services and expert witness testimony to homeowners, attorneys, building owners, builders and contractors. He also conducts fee paid construction mediations.

Affiliations:
American Society of Home Inspectors (ASHI)
Historic Building Inspectors Association (HBIA)
Society of Professional Real Estate Inspectors (SPREI)
National Association of Home Builders (NAHB)
Builders Assoc. of Greater Boston (BAGB)
Home Builders Assoc. of Massachusetts (HBAM)
National Fire Protection Association (NFPA)
International Code Council  (ICC)
National Trust for Historic Preservation
Society for the Preservation of New England Antiquities (SPNEA)

# ATTACHMENT 3

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No.: No. 04-CR-10366-MLW |
| | ) | |
| v. | ) | |
| | ) | |
| TODD LECCESE | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |

## **AFFIDAVIT OF TODD LECCESE**

I, Todd Leccese, do state on oath as follows:

1.     I began causing the fires regarding Doug Lurie to get even with him. When I started a competing store, Doug told the vendors not to do business with me. Vendors told me that.

2.     When I could not get him out of business, I harassed him using fires as an alternative way of getting even.

3.     Jose Muniz helped at first.

4.     Then I switched to Shawn Sandler. He helped me continue the harassment of Doug Lurie. He also suggested other targets – these were to put the stores out of business and I went along with him. I should not have. I am responsible for my own conduct.

5.     I knew about the firewall and sprinklers at 472 Broadway, Chelsea, from prior contact with the building and the Chelsea building code and thought these firewall and sprinklers would prevent anything from happening to anyone when Sandler set a fire there. I never believed harm to people was possible in the July 23, 2003 fire.   I also did

1

not know Sandler would try to start the store fire from the hallway for apartments above

Doug's Bargain.

6.    I regret all of this - enormously.

Signed under the penalties of perjury this _____ day of _____.

_____
TODD LECESSE

# ATTACHMENT 4

 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3      _____

        UNITED STATES OF AMERICA,
 4                      Plaintiff,
 5      V.                          Criminal Action No. 04-10148-RCL
 6      SHAWN SANDLER,              June  1, 2006, 2:55 p.m.
                        Defendant.   Boston, Massachusetts
 7      _____
 8
 9
10
11
12            TRANSCRIPT OF SENTENCING OF SHAWN SANDLER
13          BEFORE THE HONORABLE REGINALD C. LINDSAY
14                UNITED STATES DISTRICT COURT
15             JOHN J. MOAKLEY U.S. COURTHOUSE
16                   ONE COURTHOUSE WAY
17                   BOSTON, MA  02210
18
19
20
21
22               DEBRA M. JOYCE, RMR, CRR
                    Official Court Reporter
23            John J. Moakley U.S. Courthouse
               1 Courthouse Way, Room 5204
24                  Boston, MA  02210
                       617-737-4410
25

Page 2

1  APPEARANCES:
2  FOR THE GOVERNMENT:
3  Assistant United States Attorney
   DONALD D. CABELL, ESQ.
4  Office of the United States Attorney
   John J. Moakley U.S. Courthouse
5  1 Courthouse Way, Suite 9200
   Boston, MA 02210
6  617-748-3100
7
   FOR THE DEFENDANT:
8
   Federal Defender's Office
9  CATHERINE K. BYRNE, ESQ.
   408 Atlantic Avenue, Third Floor
10 Boston, MA 02110
   617-223-8061
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  here in consequence of a plea entered into an indictment
2  charging him with two counts of arson, and the first step for
3  me to take is to determine the offense level. And the
4  probation officer has determined that by using the combined
5  offense level determination for the two counts that without the
6  enhancement for career offender that the offense level is 23,
7  but that with the enhancement, the offense level becomes 32.
8  That offense level is reduced by three levels for acceptance of
9  responsibility resulting in a total offense level of 29.
10      Any objection to the offense level computation?
11      MR. CABELL: No, your Honor.
12      THE COURT: Ms. Byrne, any objection?
13      MS. BYRNE: No, your Honor.
14      THE COURT: All right. I know there's an objection
15 to -- one item that is objected to is the criminal history, and
16 there may be a motion directly to the criminal history
17 category.
18      But, in any event, the probation officer has
19 determined that I guess it's criminal history category VI on
20 the career offender, and as I thought, there's a determination
21 of offense level -- rather, criminal history category VI based,
22 in fact, on the number of scorable convictions. That results
23 in 20 total points in criminal history category VI. And, of
24 course, the career offender enhancement also places Mr. Sandler
25 in career offender category VI.

Page 3

1       P R O C E E D I N G S
2       (The following proceedings were held in open court
3  before the Honorable Reginald C. Lindsay, United States
4  District Judge, United States District Court, District of
5  Massachusetts, at the John J. Moakley United States Courthouse,
6  1 Courthouse Way, Boston, Massachusetts, on June 1, 2006.
7       The defendant, Shawn Sandler, is present with
8  counsel. The Assistant United States Attorney is present.)
9       THE CLERK: Criminal, 04-10148, United States v.
10 Shawn Sandler.
11 Counsel, please state your name for the record.
12      MR. CABELL: Good afternoon, your Honor. Donald
13 Cabell for the government.
14      THE COURT: Good afternoon.
15      MS. BYRNE: Good afternoon, your Honor. Catherine
16 Byrne representing Shawn Sandler.
17      THE COURT: Hi, how are you?
18      MS. BYRNE: Good, your Honor.
19      THE COURT: All right. You both, Mr. Cabell,
20 Ms. Byrne, have read the presentence report, have you?
21      MR. CABELL: Yes, your Honor.
22      THE COURT: And, Ms. Byrne, have you gone over it
23 with Mr. Sandler?
24      MS. BYRNE: We have gone over it, your Honor.
25      THE COURT: Let me start by saying Mr. Sandler is

Page 5

1       Is there an objection to the guideline computation
2  of criminal history?
3       MR. CABELL: No, your Honor.
4       THE COURT: Ms. Byrne?
5       MS. BYRNE: No, your Honor.
6       THE COURT: All right.
7       All right. With the offense level 29, criminal
8  history category VI, the guidelines provide for a term of
9  imprisonment of 151 to 188 months; a range of supervised
10 release of two to three years; fines of $15 to $150,000; and a
11 mandatory special assessment of $100 on each of counts of
12 conviction, or a total of $200.
13      Have I stated that correctly?
14      MR. CABELL: Yes, your Honor.
15      MS. BYRNE: Yes, your Honor.
16      THE COURT: Is there some issue regarding
17 restitution?
18      MR. CABELL: Your Honor, if I can speak briefly to
19 that. As you are aware, there are three individuals who have
20 been charged with one or more of all of the fires at issue in
21 this case, and the issue of restitution is especially difficult
22 because of the number of different properties involved, the
23 claims that have been made in different forums for restitution,
24 and the status of those claims, whether it's in litigation,
25 whether it's in mediation, or whether it's through submissions

2 (Pages 2 to 5)

1  through probation or through our office to the Court.
2       We have an estimate in this case for the charged
3  fires for which Mr. Sandler pled guilty of $95,000. No one can
4  represent that to be a true final figure. I can represent to
5  the Court that we have for months been dealing with the issue
6  of restitution, a larger issue in this case, and the effort to
7  collect the documents necessary so that everybody has a comfort
8  level that an amount we say is the amount of damages is, in
9  fact, the amount.
10      It's further complicated by the fact that in issues
11 where it's being litigated there may be an agreement as to
12 liability, but the amount of damages that is at issue and the
13 definition of restitution depend on the forum also changes.
14      What I would ask the Court to do is what we have
15 done in the case of Jose Muniz, who was sentenced in front of
16 Judge Stearns to 77 months, which was to impose an order of
17 restitution not set a specific amount but to allow the
18 government in a certain period of time to submit a figure to
19 the Court or to the defendants first or to probation, but to
20 allow the government time to come up with a more accurate
21 figure and to submit that to the Court.
22      THE COURT: Okay. Well, what does the judgment
23 say? I have to do that.
24      MR. CABELL: I don't have it in front of me, but I
25 think the judgment that Judge Stearns issued simply said words

1  to the effect restitution amount to be determined and that
2  figure would be based on additional materials submitted by the
3  parties.
4       THE COURT: And does the judgment become a judgment
5  if that number is left open, if that term is left open?
6       MR. CABELL: Well, I think the short answer is yes,
7  and I can anticipate where the Court is going --
8       THE COURT: Is that the correct answer? That's the
9  short answer, but is that the correct one?
10      MR. CABELL: I think it is.
11      THE COURT: Okay.
12      MR. CABELL: Here, your Honor, for the record, what
13 was said in the case of Mr. Muniz is the amount of restitution
14 will be determined by the Court under separate order to be
15 entered.
16      THE COURT: Okay. There is in my mind a
17 question -- I'm happy to know that somebody has done that.
18 First of all, maybe I don't need to think about it very much,
19 but I ask you, Ms. Byrne, what do you think?
20      MS. BYRNE: Your Honor, I am comfortable with that;
21 and we would agree to that. Mr. Sandler understands that there
22 will be some order of restitution and some restitution that he
23 will be responsible for, but we don't know the answer now. He
24 is prepared to go forward with the sentencing now. I just want
25 to, obviously, have the opportunity to litigate the amount if

1  that should happen in the future. Usually -- most likely, we
2  agree, but that's the only thing. So we'll just have to deal
3  with that later.
4       THE COURT: Well, as I say, I'm not sure how -- as
5  a matter of procedure how to deal with this by entering a
6  judgment that leaves open that term. After all, the sentence
7  will begin immediately, I mean, if it is to begin immediately
8  with a judgment with an amount left open, do you have a
9  judgment, for example, if Mr. Sandler wanted to appeal? Is it
10 final enough so that there could be an appeal?
11      MR. CABELL: In my view the answer to that is yes.
12 But here is a possible solution, your Honor. If after today
13 you simply waited, say, two weeks or three weeks to enter
14 judgment on the docket and gave us that amount of time to
15 submit whatever materials we were going to submit, that's a
16 short enough amount of time that I don't think it prejudices
17 Mr. Sandler; because regardless of whatever sentence that is
18 imposed, that's not going to affect much of anything. It makes
19 it finite. It's not so long a period that the Court need to
20 remain open indefinitely.
21      THE COURT: I'm happy with that, except that I
22 think Mr. Sandler should know that the Bureau of Prisons will
23 not begin to work on his designation until he has a judgment,
24 and if he's at Plymouth or wherever he may be, that period will
25 not start until two weeks -- what did you say?

1       MR. CABELL: Two to three weeks.
2       THE COURT: Two to three weeks now, and there is a
3  backlog, which I'm not sure what it is now, but there is a
4  backlog in the Bureau of Prisons of getting people designated
5  to the appropriate federal facility.
6       I'm happy with that solution. I just want to know
7  when you say it doesn't prejudice Mr. Sandler that he should
8  know it has the effect of delaying the time of his designation
9  to a federal facility.
10      MS. BYRNE: If I could just have one moment, your
11 Honor.
12      THE COURT: Yes, ma'am.
13      (Defendant conferred with counsel.)
14      MS. BYRNE: Your Honor, that's fine. And I do have
15 the copy -- if you want the exact language, I do have the copy
16 from Judge Stearns' judgment.
17      THE COURT: Can you spare that?
18      MS. BYRNE: Yes, you can have that.
19      THE COURT: Okay.
20      MS. BYRNE: Your Honor, I would just ask if you
21 could make a three-week limit just so we have a date certain by
22 which that is provided.
23      THE COURT: Today is June 1st --
24      (Discussion off the record.)
25      THE COURT: Ms. Hourihan said I did something like

Page 10

1  this before. I guess it didn't concern me then.
2      Well, I'm always learning new things. I should
3  tell you my clerk, Ms. Hourihan, is always looking after me;
4  and she says if I don't get this judgment entered, I'm making
5  it look bad because I've got this judgment outstanding for
6  three weeks. So if I do that, I'll enter some order so that we
7  don't look bad. And I have to tell you, when they do those
8  national statistics, I'm always looking to make sure that
9  whoever looks bad in this court, it ain't me.
10      (Discussion off the record.)
11      THE COURT: Okay. I didn't do it, some other thing
12  I did. I just like to know I'm consistent.
13      Okay. So if you go along with this, I'll enter an
14  order, kind of a temporary order that says judgment to be
15  entered -- there will be a three-week period during which the
16  parties will attempt to resolve the restitution question, and
17  during that period the judgment will not enter until whatever
18  date three weeks is from now. That would be the 21st --
19      MR. CABELL: 22nd --
20      THE COURT: Oh, sorry. About the 21st, something
21  like that.
22      THE CLERK: 22nd.
23      THE COURT: All right. June 21st.
24      Now, Ms. Byrne, you have a motion for a departure
25  or a 3553 sentence in which the question is primarily about the

Page 11

1  likelihood of Mr. Sandler's committing another crime in the
2  future?
3      MS. BYRNE: Primarily, your Honor, although there
4  is also the significant issue of the sentences that the other
5  parties in the case have faced or will face.
6      THE COURT: Okay. Can you elaborate a little bit
7  for me on your view?
8      MS. BYRNE: Yes, your Honor.
9      Your Honor, if you don't mind, I'm going to
10  stand -- will the mic pick it up if I stand here?
11      THE COURT: You can stand behind that podium over
12  there if you'd like.
13      MS. BYRNE: Thank you.
14      Your Honor, there are three points that I would
15  like to make regarding Mr. Sandler's sentence in helping the
16  Court reach a sentence that is sufficient but not greater than
17  necessary and a just sentence in this case.
18      THE COURT: Okay.
19      MS. BYRNE: First, your Honor, that his designation
20  as a career offender significantly overrepresents the
21  likelihood that he will commit other crimes after his release
22  from incarceration.
23      Two, that his extraordinarily traumatic childhood,
24  which resulted in mental illness, post-traumatic stress
25  disorder and depression and led to heroin addiction, are

Page 12

1  factors that the Court must take into account.
2      Three, there is a far more culpable co-defendant in
3  this case, who planned and initiated at least 11 fires, your
4  Honor, and who was well into a plan to burn down -- burn out
5  his competition in Chelsea prior to Mr. Sandler even being
6  brought into this case after a two-year period of fires that
7  were ongoing. And this other individual is going to receive a
8  significantly shorter sentence.
9      My understanding is that -- and I believe I
10  underestimated it slightly in my sentencing memorandum. The
11  other individual is Todd Leccese, who is -- his sentence is
12  pending before Judge Wolf, but --
13      THE COURT: How is it -- well, I guess it's just
14  the way the indictments went that I don't have everybody?
15      MS. BYRNE: Right. Judge Stearns had one of the
16  individuals who Mr. Leccese had hired, a guy who was kind of
17  similarly situated to Mr. Sandler, the guy, Mr. Muniz who we
18  just referred to; and Judge Wolf has Todd Leccese.
19      In any way, Mr. Leccese is -- was a store owner,
20  you know, a businessman in Chelsea, a guy who, you know, was
21  doing well, well off, and he just decided that he was going to
22  burn out his competition. And the way he did it was he had a
23  plan and he executed over a long period of time and he had a
24  lot of fires and actually caused people to have to leave, some
25  of whom I think may even be here. Had to close down their

Page 13

1  business for various periods of time or just plain give up.
2      The way he did it was he hired desperate drug
3  addicts to do the work for him. As I said, he was well into
4  this before Mr. Sandler even came onto the scene in the two
5  fires that he's charged in.
6      And this guy, Mr. Leccese, is the one who has
7  cooperated with the government, and your Honor knows how that
8  works.
9      THE COURT: The sharks go free and the minnows
10  go --
11      MS. BYRNE: I really think this it is a very
12  classic case of that situation. It's not always that
13  situation, it isn't, but that's what's going on here, because
14  this guy is facing -- apparently, his low end guideline is 63
15  months. I think I may have underestimated it a little bit in
16  my sentencing memo, but it's 63 months low end before any
17  objections are dealt with by the defense. And, of course, he
18  is definitely getting a 5K. He has cooperated. He has a plea
19  agreement signed, so he's going to be -- and it's pending
20  before Judge Wolf, as I said. So he's looking at three to four
21  years at the most in prison for all of this stuff, 11 fires,
22  over these many years, hiring people, drug addicts, like
23  Mr. Sandler, to do his dirty work for him.
24      So I think that's a very important factor to keep
25  in mind here in sentencing Mr. Sandler, your Honor, in terms of

US v. Sandler, Sentencing 6/1/06

Page 14

1  justice and fairness and disparity.
2      So, your Honor, I'm assuming -- you have my
3  sentencing memo, and I don't want to, you know, go through all
4  of the facts. I will if you want me to fresh your memory about
5  everything, I will go through all of them.
6      THE COURT: You know, I have -- my first review of
7  this was sometime ago, and it was -- so it might be helpful to
8  me, in the interim a lot of things happened.
9      MS. BYRNE: I'm very happy to do that, but I just
10  didn't want to do if you didn't want me to.
11      THE COURT: No, no, I want you to.
12      MS. BYRNE: The situation here is that Mr. Leccese,
13  as I said, was the owner of this bargain goods store in
14  Chelsea. He devised this plan to eliminate his competition by
15  having fires set over this two-year period.
16      After two years into the plan Mr. Sandler was
17  solicited by Mr. Leccese, paid a few hundred dollars to set the
18  fires which occurred on June 19th and July 23rd, and those are
19  the cases that are before your Honor.
20      The buildings were damaged, no question. There was
21  water damage. No one was injured as a result of the fires,
22  fortunately.
23      The probation department has determined Mr. Sandler
24  qualifies as a career offender, and your Honor knows what that
25  means. So he's -- instead of facing a range of 92 to 115

Page 15

1  months, he's facing 151 to 188 months.
2      Your Honor, we are not before the Court asking for
3  92 months, we are not before the Court asking for something
4  that is, you know -- which I think actually would be
5  reasonable, such as seven or eight years. We're before the
6  Court asking for ten years, your Honor, which is 120 months,
7  120 months as compared to the -- let's say the biggest sentence
8  Mr. Leccese will get, which is 48 months, 120 months versus
9  that. And 120 months versus the 77 months that the similarly
10  situated Mr. Muniz received from Judge Stearns, your Honor.
11      THE COURT: Which one was Mr. Muniz.
12      MS. BYRNE: Jose Muniz is the judgment you have in
13  front you.
14      THE COURT: What was his --
15      MS. BYRNE: His role, and Mr. Cabell could speak
16  more to it --
17      THE COURT: No, no, but the sentence.
18      MS. BYRNE: The sentence was 77 months, I believe,
19  your Honor.
20      THE COURT: Okay.
21      MS. BYRNE: Is that correct?
22      PROBATION OFFICER: Yes.
23      MS. BYRNE: Sorry, I was just checking with
24  probation. I didn't want to misspeak, but that's what it was.
25      THE COURT: Okay.

Page 16

1      MS. BYRNE: Anyway, Mr. Sandler is 40 years old
2  now. He is a heroin addict for many, many, many years. He has
3  been diagnosed with post-traumatic stress disorder. Your Honor
4  has an extensive evaluation. This was an evaluation that was
5  done by a very qualified psychologist, which you have. He
6  performed numerous tests. There were at least two lengthy
7  meetings with Mr. Sandler. He reviewed all of the documents,
8  including records that I was able to get from the '60s from
9  Children's Hospital and also from DYS pertaining to
10  Mr. Sandler. So it's very complete.
11      But, anyway, Mr. Sandler was diagnosed but never
12  treated for post-traumatic stress disorder as a result of his
13  extremely, unusually traumatic childhood; and also for
14  depression, which he also has never been treated for.
15      And one of the points that Dr. Davidoff, who is the
16  psychologist who evaluated him, makes is that his heroin
17  addiction is, in his view, as a result of the circumstances
18  that he underwent and his mental illness that hasn't been
19  treated, your Honor.
20      The most significant points about his background
21  that I just would like to --
22      THE COURT: You don't mean mental illness, do you?
23  You said mental illness.
24      MS. BYRNE: Post-traumatic stress disorder I think
25  is characterized as mental illness in DSM -- I don't know which

Page 17

1  DSM we're up to, your Honor.
2      THE COURT: Okay.
3      MS. BYRNE: But it is as a result of his traumatic,
4  extremely traumatic childhood.
5      Mr. Sandler's -- the abuse that he underwent is --
6      THE DEFENDANT: No more of that, just sentence me.
7  No more of that.
8      MS. BYRNE: Your Honor, just a minute?
9      THE COURT: I think you should speak to him.
10      THE DEFENDANT: I just want to be sentenced, no
11  more.
12      (Defendant conferred with counsel.)
13      THE COURT: All right. Go ahead.
14      MS. BYRNE: Your Honor, I want to just say that
15  this is extremely traumatic for him to go through again. So I
16  don't know if you've had a chance to read this recently, but I
17  would ask if you could just take five minutes or so for you to
18  review the pages, particularly pages 3 --
19      THE COURT: I have.
20      MS. BYRNE: -- through 6.
21      THE COURT: I have.
22      MS. BYRNE: Because he just doesn't want me to go
23  through the details of that again.
24      THE COURT: Okay.
25      MS. BYRNE: All right. And let me just say that it

US v. Sandler, Sentencing 6/1/06

Page 18

1  was difficult to get a lot of this information from him, but a
2  lot of it was things that are actually documented. And so that
3  was the way that I got to it.
4      THE COURT: Okay.
5      MS. BYRNE: And probably no one has ever been able
6  to in the past.
7      In any case, your Honor, so in terms of just going
8  to the argument section of my sentencing memo, I've discussed
9  the disparity between him and Mr. Leccese. But I do want to
10  say that one of the things that Dr. Davidoff has said here is
11  the outlook for Mr. Sandler is actually quite good with
12  treatment. He hasn't had treatment and with treatment his
13  likelihood of recidivism is actually lower than you could
14  expect. And that's something that he needs, that he's willing
15  to have, and that you can impose as part of the sentence. And
16  I would suggest that if you give him the sentence which I am
17  requesting, which is a ten-year sentence, as I said, that you
18  give him the higher supervised release, which would be three
19  years and that you make mental health treatment a part of
20  that. And I would also ask on the treatment angle that the
21  Court recommend the 500-hour drug treatment program, which he
22  wants to participate in, which your Honor knows is a very good
23  program, and something which will be helpful to him.
24      Further, your Honor, in terms of the need for this
25  sentence to afford adequate deterrence to criminal behavior,

Page 19

1  criminal conduct, this is a -- we're looking for a ten-year
2  sentence for a 40-year-old man, your Honor. He will be close
3  to 50 years old when released. The likelihood of recidivism
4  for someone in that age range is lower as well. So that's
5  something I would ask the Court to take into account.
6      If I could just have a moment, I want to make sure
7  I don't neglect to say something important.
8      THE COURT: Okay.
9      (Pause.)
10      MS. BYRNE: Your Honor, I would just point to pages
11  14 through 16 of my sentencing memo in which I laid out cases
12  that have come before this court, not just your Honor, but
13  other judges in this court, where judges have departed
14  significantly in very similar situations. I'm not -- for
15  example, in Chavez Champagne, where I actually represented
16  Mr. Champagne before Judge Zobel, she departed from 262 months
17  to 124 months in a similar situation, where mental health
18  issues resulting in addiction led to the criminal conduct. And
19  also a career offender, criminal record, but the mental health
20  issues had not ever been treated or addressed. There's one
21  example, your Honor.
22      Tony Smith, 151 months to 78 months. That was
23  Judge Gertner. Similarly suffering from a depressive disorder,
24  heroin addiction as a result of a traumatic background that had
25  never been paid attention to or treated.

Page 20

1      Judge Young, a similar situation from 262 months to
2  96 months, because I think the effect of this career offender
3  business is an undue and/or excessive enhancement of the actual
4  culpability of your criminal history.
5      David Glavin, Judge Wolf, 151 months to 86 months,
6  where the defendant grew up under particularly miserable
7  circumstances and thus developed heroin addiction, et cetera.
8      Justin Teal, Judge Stearns --
9      THE COURT: That's all right, I got all of this.
10      MS. BYRNE: Thank you, your Honor. I just want to
11  point out to the Court that this is not something -- that this
12  is not something outrageous that I'm requesting, that this is
13  reasonable under the circumstances; and, as I said, I'm asking
14  for more time than most of the people in those cases that I've
15  cited to for Mr. Sandler.
16      So under the circumstances, your Honor, given his
17  past, the lower likelihood of recidivism than his record
18  reflects, and the disparity and the injustice that will occur
19  if he is to receive a 12-and-a-half-year sentence, which is the
20  low end of the guidelines, versus the sentences that the other
21  people that are involved in this case are going to get or have
22  gotten.
23      For those reasons, your Honor, I'm asking the Court
24  to sentence Mr. Sandler to 120 months.
25      THE COURT: Thank you, Ms. Byrne. Mr. Cabell?

Page 21

1      MR. RUGO: Excuse me, your Honor, I'm sorry to
2  interrupt. I'm a victim in the case, can I --
3      THE COURT: Mr. Cabell?
4      MR. RUGO: Please.
5      THE COURT: Yes.
6      Do you want to say something personally to me?
7      MR. RUGO: I'd like to speak to him first.
8      (Discussion off the record.)
9      MR. CABELL: Your Honor, this is Mr. Rugo, who is
10  one the property owners affected by one of the charged fires,
11  and at whatever point the Court deems it appropriate, he would
12  like to speak to the Court.
13      THE COURT: Okay.
14      Mr. Rugo, why don't you have a seat, and I will --
15  I want to hear from Mr. Cabell, and then I'll hear from you.
16      MR. RUGO: Thank you.
17      MR. CABELL: Thank you.
18      THE COURT: Or do you want me to hear from Mr. Rugo
19  first?
20      MR. CABELL: I was going to say wherever you think
21  is appropriate. I wanted to respond to Ms. Byrne and at least
22  let the Court know what the government's recommendation was,
23  and whether your think it's more appropriate to hear from
24  Mr. Rugo should go first or following those statements. It's
25  as the Court wishes.

US v. Sandler, Sentencing 6/1/06

Page 22

1    THE COURT: Why don't you go ahead.
2    MR. CABELL: Okay. And I begin by recognizing
3 where Ms. Byrne ended, is that she's asking the Court to impose
4 a sentence that is more than what some defendants have gotten
5 in departure cases based on their backgrounds.
6    Nonetheless, your Honor, this is a case where we're
7 asking the Court to impose a term of 151 months in prison to be
8 followed by three years of supervised release. Based on the
9 defendant's apparent financial circumstances we're not seeking
10 a fine. The issue of restitution is going to be resolved; and,
11 of course, there's a $200 special assessment fee.
12    And as part of that, I'd like to first respond to
13 the bases that Ms. Byrne is urging on the Court to depart. The
14 first is the risk of recidivism, as she lays it out, and
15 although that's not one she talked about in depth now, we just
16 simply have no basis on the record before us for the Court to
17 conclude that Mr. Sandler is not likely to recidivate when
18 released from prison.
19    In essence, the argument is because he's going to
20 be older it's less likely he's going to commit crimes.
21    THE COURT: Aren't there some studies that say the
22 older you are the less likely you are to recidivate?
23    MR. CABELL: That's true, your Honor, but you have
24 to assess that general argument in the context of the specific
25 circumstances of the defendant before the Court.

Page 23

1    Without belaboring the presentence report, I simply
2 note that in the 20-year span of criminal history that it
3 summarizes from 1981 to 2002, the defendant has independent,
4 separate convictions for burglary, grand theft auto, drug
5 possession, drug distribution, assault in the third degree in
6 which he shot at a security guard, breaking and entering in the
7 daytime, and carrying a dangerous weapon. And I think it's
8 fair for the Court to view the present offenses as part and
9 parcel of a seamless history of criminal conduct, and one in
10 which it appears to be an escalation in potential dangerousness
11 of the conduct.
12    So on the record before the Court -- yes, in
13 general we know from a statistical point of view people are
14 less likely to commit crimes as they get older, but it's not a
15 bases to depart on this case.
16    The defendant's childhood --
17    THE COURT: How do you respond to Ms. Byrne's
18 proposition that there can be a difference between past and
19 future if treatment is provided to Mr. Sandler?
20    MR. CABELL: I think the answer is essentially the
21 same, which is we are talking about speculation. We know that
22 if somebody is properly diagnosed, wants to get better, and is
23 in a situation where the treatment is available, it may have a
24 beneficial impact.
25    THE COURT: But the psychiatrist said with

Page 24

1 treatment -- there is something different. The expert says
2 with treatment there's a low risk of recidivism.
3    MR. CABELL: The fallacy or the weakness of that
4 argument is it can be presented in every case before the
5 Court. We simply don't know what's going to happen until the
6 defendant is had an opportunity where they can demonstrate that
7 they, in fact, are going to go through with the treatment and
8 make an attempt to get better.
9    I'm simply suggesting to the Court on the basis of
10 the record that we have here -- and we have to presume,
11 although I can't say for certain, but we have to presume that
12 Mr. Sandler has had opportunities in the past to receive
13 treatment --
14    THE COURT: Why do we presume that?
15    MR. CABELL: Well, having been prosecuted and
16 convicted of offenses throughout the years, where his substance
17 abuse problems were well-noted, I simply inferring that
18 as part of the response by the judicial system to his conduct
19 there would have been some effort to provide treatment along
20 with any punishment that was meeted out.
21    THE COURT: All right. And let me ask you in very
22 specific terms, Mr. Cabell, and this is the most -- the
23 difficult question for you to answer, if you have an opinion
24 from an expert that with treatment Mr. Sandler -- the risk of
25 recidivism lowering and there is no question he -- I assume

Page 25

1 there's no question he has an undiagnosed psychological
2 impairment, and the question, and this is the real key to this,
3 is the difference between 12 and a half years and ten years.
4 What is it about the extra two and a half years that makes that
5 sentence -- a 12-and-a-half-year sentence reasonable and a
6 10-year sentence not reasonable?
7    MR. CABELL: It is that that two and a half years
8 reflects, in part, a consideration of the rest of the factors
9 that are set out in 3553(a). If we're in a vacuum and we're
10 only basing it on the risk of recidivism, then I think the
11 proposition is a reasonable one, that if it's been undiagnosed
12 up until now and now it's diagnosed, there's an ability to get
13 treatment. And we can all sit here and say there's a
14 likelihood that he's not going to commit the crimes. I'd agree
15 with you going down to ten in those circumstances might be
16 reasonable.
17    THE COURT: Let's take those factors. You are
18 talking about deterrence, general and specific. What is it
19 about the two and a half years that gives -- except that it's
20 more time -- gives you more deterrence?
21    MR. CABELL: It's not just deterrence, your Honor.
22 It's deterrence as well as the specific nature and
23 circumstances of this offense.
24    THE COURT: I understand.
25    MR. CABELL: All right. In this case, your Honor,

US v. Sandler, Sentencing 6/1/06

Page 26

1  it is as follows: It is we have what was essentially a
2  concerted effort to not only disrupt businesses, but to
3  eliminate, to drive well-established businesses out of the
4  Chelsea area. It was an effort to do it, in this case by
5  Mr. Sandler, just for money.
6      Now, Ms. Byrne said a few hundred dollars, we would
7  suggest it was several hundred dollars per fire, and that cuts
8  both ways. On the one hand, she's right, Mr. Leccese is the
9  person who masterminded this, he was the one out to get the
10  business. On the other hand what it demonstrates is such a
11  callus disregard for the ramifications for what he was doing
12  that Mr. Sandler, for several hundred dollars, would wreak the
13  havoc that he has wreaked and causing damage not only to
14  businesses; that is, the particular property owners that were
15  targeted, but there was an apartment building connected to one,
16  and so tenants were potentially put at risk. There was a
17  McDonald's that sustained approximately $50,000 in damage.
18      And these acts were committed by someone who --
19  this is not an instance, as in some of the other cases cited by
20  Ms. Byrne, some of which I prosecuted, where the -- when it
21  was clear that somebody with a drug problem who needed a fix,
22  did a no-job in order to get money to pull it off. This was --
23  these were instances where Mr. Sandler on a number of occasions
24  talked with Mr. Leccese, they talked about which businesses
25  target, when it would be done, Mr. Sandler would go out and do

Page 27

1  it. It was methodical, it was deliberate, and it was done by
2  somebody who is a true career offender. When I say a true
3  career offender, not just a career offender in the literal of
4  the guidelines, but a true career offender, somebody who has
5  amassed 20 criminal history points in the course of their
6  career. As the Court is well aware that under the guidelines
7  you reach the highest criminal history when you reach 13
8  points. Well, at 20 points Mr. Sandler would easily be a nine
9  or a ten if they went up that far.
10     In addition -- and this is something Mr. Rugo can
11  attest to -- in the course of investigating these offenses,
12  when businessmen in Chelsea and when law enforcement officials
13  were offering the rewards for anyone who could give
14  information, Mr. Sandler actually pose as somebody who had
15  information and met with Mr. Rugo and others and actually
16  collected money from the very people whose businesses that he
17  had burned while giving them some information but not enough to
18  implicate himself.
19     Having said that, your Honor, I think the Court
20  needs to send a message to others who are similarly situated,
21  those who have the moniker of career offender and who commit
22  multiple offenses of violence need to receive a sentence that
23  reflects the seriousness of their conduct.
24     I note that the sentence we're asking the Court to
25  impose is the low end of the career offender range, the 151

Page 28

1  months. That's significant in part because of the quirk of the
2  guidelines, Mr. Sandler gets no bump, there's no increase in
3  range for multiple fires. That range would be the same if it
4  was one, two, three, or four fires. So at a minimum, to
5  reflect the fact that these were multiple fires committed over
6  time, that sentence of 151 months needs to be imposed.
7      So it's for that reason, it's in total why we think
8  151 months is the least amount of time the Court can impose
9  that would comply with the principles of 3553(a).
10     THE COURT: Do you believe that it is appropriate
11  for me in determining this sentence in this case and take into
12  account the offense as a whole to consider what I described to
13  Ms. Byrne as the shark-minnow concept in this respect: You
14  have Mr. Sandler, who has a drug addiction, long history of
15  criminal activity, and you have this other person, a business
16  person, I don't know if he had any criminal history --
17     MR. CABELL: He had none.
18     THE COURT: He had no criminal history.
19     MR. CABELL: No.
20     THE COURT: -- who masterminds a campaign of fire
21  and destruction, and he engages people like Mr. Sandler who are
22  down -- maybe it's not down on their luck, but who are
23  outcasts. And I'm not minimizing outcasts, because we're
24  talking about criminal activity that makes them an outcast.
25  But the mastermind engages somebody.

Page 29

1      Now, in part what's happened to the mastermind is
2  that he has no criminal record, and he gets the benefit of a
3  substantially lower sentence than Mr. Sandler ever would face
4  because of his, Mr. Sandler's, criminal record and
5  Mr. Leccese's absence of criminal history.
6      But the difference between those two is two and a
7  half times or something more or less, in which the mastermind
8  was a mastermind campaign of multiple fires. Mr. Sandler
9  pleads to two in that multiple, and most of his sentence being
10  driven by -- much of his sentence is being driven by his
11  criminal history category.
12     MR. CABELL: Right.
13     THE COURT: If I take the picture as a whole, you
14  have the foot soldiers taking most of this and the general
15  getting the best of the deal.
16     Now, as I say, I recognize part of that has to do
17  with their own criminal history, but is that something I should
18  take into account to discern what is a reasonable sentence is
19  the fact that the foot soldiers are really the guys who do the
20  ones and the twos less than people who plan the 11s and the 12s
21  in the campaign? Do you follow my point?
22     MR. CABELL: I do. And I think the answer is you
23  should not. And the reason is because, as you have noted
24  throughout, the principle that defendants who create -- commit
25  similar types of crimes should receive similar types of

US v. Sandler, Sentencing 6/1/06

Page 30

1 sentences is qualified in part or it has to be considered in
2 harmony with the equally important and explicit notion that
3 defendants receive sentences based on their criminal past as
4 well.
5          The only difference, the only reason Mr. Leccese
6 chooses -- not chooses or stands to receive a far lesser
7 sentence than Mr. Sandler is because of his criminal record.
8          I agree with everything the Court said, and I'm not
9 trying to downplay anything that Mr. Leccese has done. But for
10 him, none of us would be here. The arsons would not have been
11 committed. He was responsible for all of them, even if
12 physically he was not present. He has pled to three of them,
13 as opposed to Mr. Sandler having been charged and pled to two.
14 And it is a fact -- the fact that they are in such different
15 places is driven entirely by their criminal past. And I can
16 repeat that and repeat that and repeat that, but the fact of
17 the matter is it's that simple, your Honor.
18          THE COURT: I take your point.
19          MR. CABELL: It's that simple. And Mr. Leccese, we
20 have been speaking generally about what his range is and what
21 he's likely to face, but the fact is nobody knows what he's
22 going to receive until, in fact, he is sentenced.
23          I would note that whatever order of restitution we
24 end up with respect to Mr. Sandler, it is almost certainly
25 going to be substantially larger with respect to Mr. Leccese.

Page 31

1 They are in different positions. I don't think the Court
2 should take into consideration what Mr. Leccese may receive in
3 determining what Mr. Sandler should receive based on his
4 conduct.
5          THE COURT: Thank you.
6          Mr. Rugo.
7          MR. RUGO: Yes, sir.
8          THE COURT: Why don't you come over to this podium
9 over here where there is a microphone and speak, please.
10          MR. RUGO: Okay.
11          THE COURT: Why don't you start by telling me your
12 name and how you are involved in this matter.
13          MR. RUGO: My name is Paul Rugo, and I was the
14 owner of 466 to 472 Broadway in Chelsea, which is where Doug's
15 Bargains.
16          There were also 17 apartments in the building. It
17 was a low-income housing development geared towards housing for
18 handicapped, elderly, and low-income working families. And
19 there were approximately 60 occupants in the building. Overall
20 there were, I believe, seven arson attempts at the property.
21 The last one, which is the one I believe we're talking about
22 today on July 23rd, was the most significant, caused an inferno
23 inside a fire stairwell inside the building, which burned up
24 through the building and interfered with how the tenants were
25 able to get out. Luckily, they were all able to get out.

Page 32

1 Thankfully the fire department is within five minutes and got
2 there very quickly and helped the people that were handicapped
3 or elderly out of the building.
4          After that fire, I posted a reward of $5,000, and
5 Shawn Sandler within two months came forward saying he had
6 information about the fires. The first time that I met with
7 him he told me who had been doing the fires because he worked
8 for him.
9          THE COURT: He said what, sir?
10          MR. RUGO: He worked for him, meaning he did
11 other --
12          THE COURT: Can you start that again. He said to
13 you what?
14          MR. RUGO: Shawn told me that he worked for the
15 person who was causing the fires.
16          THE COURT: Okay.
17          MR. RUGO: But the work that he did involved
18 beating somebody up over a $10,000 debt, which Shawn was
19 supposed to get $2,000 but didn't get paid. So that was his
20 reason for coming forward, that he was angry that he had not
21 been paid.
22          And every time we met he provided information about
23 the fires. He would not initially identify the other person.
24 Every time we met I paid him money. He dictated the terms of
25 the meeting. He would have me move around to impede police

Page 33

1 observation, and overall he was, you know, an intelligent,
2 articulate, and well-motivated person.
3          My point being that hearing him described as a drug
4 addict or someone not responsible for his actions is not the
5 person that I was dealing with.
6          I think that's all I'd like to say.
7          THE COURT: Thank you, Mr. Rugo.
8          MR. RUGO: Thank you.
9          THE COURT: Is there anybody else present who
10 wishes to be heard?
11          Okay. Ms. Byrne, you wish to say something else?
12          MS. BYRNE: Yes, your Honor, I did want to respond
13 to a couple of points that Mr. Cabell made.
14          And first, I do want to say that in -- I would like
15 to address to Mr. Rugo that there is definitely nothing --
16 there was no -- I did not intend in my argument in any way to
17 imply that Mr. Sandler is not taking responsibility for his
18 actions or in any way blaming what he did on the fact that he
19 was addicted to drugs. I mean, the fact of the matter is,
20 that's not an excuse, and that was not the intention of my
21 argument.
22          The fact is, though, that the Court has to consider
23 the history, nature, and circumstances of the offense and the
24 history and characteristics of the defendant. That's something
25 that the Court has to consider under the law that's to be

9 (Pages 30 to 33)

Page 34

1  applied in sentencing here. And, therefore, the defendant's
2  background and his history is important and something that the
3  Court must consider.
4       First of all, I would just point out that the
5  argument that Mr. Cabell made about that mental health
6  problems, you know, shouldn't be considered here because anyone
7  could say that they've got mental health problems. Certainly,
8  you read the doctor's report, and that is credible. It's
9  backed up by evidence. It's backed up by hospital records that
10 date back to when Mr. Sandler was three years old. And to say
11 that this could be just like anybody who come in here with
12 this, that's not true, your Honor. This is someone who
13 underwent -- you know, doesn't have anybody looking out for
14 them to get treatment, and for the first 16 years of his life
15 was not just neglected, but physically abused. And that is not
16 a typical person before this Court.
17      And to imply that the cases that I cited where
18 there were departures in this district for career offenders and
19 departures or sentences under 3553 factors, whether they were
20 considered guideline departures or just variances, whichever,
21 these are not all no job bank robbery cases, your Honor. There
22 are many cases that are similar to Mr. Sandler's case and some
23 which are worse, in fact. I just want to make it clear on
24 that.
25      Also, the argument that Mr. Cabell is making

Page 35

1  basically you could never sentence a career offender lower than
2  151 months where they have mental health issues or severely
3  traumatic upbringing, something that's gone untreated, because
4  we can never know whether treatment is going to help them or
5  whether they're going to participate in it, and that's just not
6  the law and that is not what is happening in all these cases I
7  referred to, your Honor.
8       And in terms of sentencing people that are
9  similarly situated, your Honor, certainly you can consider
10 what's going to happen to Mr. Leccese as compared to
11 Mr. Sandler. There's no question about that. I thought
12 Mr. Cabell was trying to suggest you shouldn't consider that.
13 Obviously, you're going to consider that. As you say, that's
14 tragic and unfair that the guy who's got the private lawyer and
15 the money to pay to pay off the restitution is going to get,
16 you know, not just half, but you know, probably a quarter of
17 what Mr. Sandler is going to serve for a sentence.
18      And, yes, Mr. Sandler has a criminal record, but
19 still that's not right, especially where Mr. Leccese is
20 responsible for this big campaign over years of trying to burn
21 out people like Mr. Rugo and other people in Chelsea, your
22 Honor.
23      And, by the way, just to point out the fact that
24 there were residents in the building above where the fire
25 occurred in Mr. Leccese's charges, three of the ones that he

Page 36

1  was charged with involved that same situation, not one, your
2  Honor, three. So, again, in terms of putting people in danger.
3       I just wanted to tell the Court one other thing. I
4  did investigate what the career offender sentences in this
5  district were when there were departures or variances below the
6  guideline sentences. Just so that I could tell the Court,
7  because Mr. Cabell is suggesting, of course, that Mr. Sandler
8  should be sentenced as a career offender and that career
9  offenders should just get the career offender of 151-month
10 sentence period. But, in fact, in 2006 there were 16 career
11 offenders sentenced -- this was as of May 12th -- 16 career
12 offenders sentenced in -- here. Six were given below guideline
13 sentence, your Honor. These were not 5Ks.
14      In 2005 there were 46 career offenders sentenced in
15 this district. Twenty-six were given below guideline
16 sentences. Presumably some of those were 5Ks, but that's 57
17 percent of career offender sentence where people were not
18 sentenced to the career offender guidelines.
19      So your Honor should be very comfortable with a
20 sentence of ten years in a case such as this. And so I would
21 ask the Court to impose the ten-year sentence that we
22 requested.
23      THE COURT: Thank you, Ms. Byrne.
24      Mr. Sandler, is there anything you'd like to say?
25      THE DEFENDANT: Yes, please.

Page 37

1       (Discussion off the record.)
2       THE DEFENDANT: First, I'd like I accept
3  responsibility and apologize to these guys, whether you believe
4  me or not. If I -- the drugs put me in a bad place, they put
5  me in a bad spot. I never meant for nobody to get hurt. I
6  never wanted anybody to get hurt. If I wasn't there, I
7  wouldn't have been there. It took me to a bad place. I'm not
8  good with words. I kind of mumble a lot. I do apologize. I
9  never wanted no one to get hurt. I am here. I make no --
10 excuse me. I'm a grown man. Regardless whatever happened, I
11 put myself where I put myself. You know, speaking with my
12 lawyer, she explained to me some good programs or whatnot in
13 the institution to try to go and help myself. And I heard
14 Mr. Cabell say -- I don't know how to say it, back in the day
15 when I was -- they just throw you in the jail, that was the end
16 of it. There was no help for you this like there is now,
17 there's drug courses and programs. NA, AA was a joke.
18      I don't know, your Honor. I'm not -- like I say,
19 I'm a mumbler, and I know I'm mumbling right now; but I do
20 accept responsibility for what I've done, you know. I am 40, I
21 got a son who's going to be four. That's my life right now. I
22 have to strive to get out here to be with him. Whether these
23 folks think I'm going to commit more crime come back, it's not
24 going to happen. I know in my head, in my heart, my son is my
25 number one priority. I have to be out there for him. I can't

US v. Sandler, Sentencing 6/1/06

Page 38

1 be the parents that I had. Excuse is nothing, I just want to
2 get out there. I have to do it for me to do it for him. I
3 know I'm not going to do nothing when I get out.
4          I don't know what else to say. I'm not good with
5 this. I'm not. I thank you for the time. And you guys
6 honestly, man, whether you believe me or not, I never meant to
7 hurt anybody.
8          MR. RUGO: I tried to help you, Shawn.
9          THE DEFENDANT: I know.
10         MR. RUGO: I gave you that opportunity.
11         THE COURT: Thank you.
12         The process of sentence must be an individual
13 process. I am, as I say, concerned about the difference in the
14 treatment between Mr. Leccese and Mr. Sandler, but there is a
15 difference between them as individuals, as Mr. Cabell has
16 pointed out.
17         I don't know very much about Mr. Leccese's case,
18 but I have before me Mr. Sandler, who has a substantial
19 criminal history, what Mr. Cabell calls a true career
20 offender. Sixteen juvenile adjudications, juvenile adult
21 convictions, including convictions for violent crimes like
22 breaking and entering, assault with a dangerous weapon. I have
23 looked through the criminal history, and I see that it might be
24 the longest sentence ever imposed might have been two years
25 committed, I'm not sure, but something like that.

Page 39

1          This offense was committed within a short period
2 after Mr. Sandler's release from another sentence. His history
3 does not predict for me -- does not give me comfort that he
4 will be easily be deterred from crime in the future except with
5 a long sentence. And so ten years is a long sentence. What's
6 the difference between ten years and 12 and a half years? And
7 I make the determination actually, frankly, after listening to
8 Mr. Rugo, because I have a better picture of this offense.
9          This is an offense, as I heard Mr. Rugo say,
10 committed where there were a number of especially vulnerable
11 victims who were put in danger. And I can't ignore that, or
12 can't think that that requires serious consideration and may
13 provide the answer between ten years and 12 and a half years.
14         Then I consider the what I am going to call --
15 well, I don't want to characterize it, but the additional
16 factor that Mr. Sandler made Mr. Rugo twice a victim.
17         I think there's a certain sociopathy in that that
18 is not relieved by the fact that Mr. Sandler had a terrible
19 childhood. He did and I do not overlook that and I do not put
20 aside the fact that he had an undiagnosed and untreated
21 condition, but there is something especially dastardly about
22 the constellation of surrounding this offense, including the
23 specially vulnerable victims for which there is no necessary
24 adjustment. The probation department talked about putting
25 firefighters at risk and first responders, but the people who

Page 40

1 lived in those apartments were especially vulnerable. And then
2 the second effort, the collecting money from Mr. Rugo, who was
3 trying to figure out what happened to him and how it happened.
4          So I'm not going to grant any departure. I'm going
5 to sentence Mr. Sandler in accordance with the guidelines,
6 because I think the guidelines provide a reasonable range.
7          The break I am going to give Mr. Sandler is that I
8 am going to sentence him at the low end, because I think an
9 argument can be made that a sentence higher than the low end
10 can be appropriate under the circumstances of this offense.
11         So in recognition of the problems of his childhood
12 and his undiagnosed mental condition, I will sentence him at
13 the low end of the guidelines.
14         Mr. Sandler, if you'll stand, please.
15         Mr. Sandler, it's the judgment of the Court that
16 you be committed to the custody of the Bureau of Prisons to be
17 imprisoned for a term of 151 months. That's a term of 151
18 months on each count to be served concurrently. I will
19 recommend to the bureau that you participate in the 500 hour
20 residential drug treatment program.
21         Following your release from imprisonment you'll be
22 placed on supervised release for a term of three years. This
23 is a term of three years on each of the counts of conviction to
24 be served concurrently.
25         I will order restitution in an amount to be

Page 41

1 determined, and I will suspend the entry of this judgment until
2 that restitution amount has been agreed upon or until some
3 other resolution of it has been made or June 21st, whichever
4 later occurs.
5          I will order that the restitution amount be paid
6 immediately or according to a schedule that I will establish.
7 Those payments are to be made to the clerk of this Court to be
8 transferred to the victims.
9          You will notify the United States Attorney for this
10 district within 30 days of any change in your mailing address
11 that occurs while any portion of the restitution amount remains
12 unpaid.
13         I will impose no fine because of Mr. Sandler's
14 financial circumstance and because of the restitution he's
15 going to be required to pay.
16         Mr. Sandler, while you are on supervised release
17 you will comply with the following terms and conditions: You
18 are not to commit another federal, state, or local crime, you
19 are not to illegal possess a controlled substance. You are to
20 refrain from any unlawful use of a controlled substance. You
21 will submit to one drug test following your release and within
22 15 days following your release and to at least two periodic
23 tests thereafter not to -- a year not to exceed 104 tests a
24 year.
25         You will submit to the collection of a DNA sample

US v. Sandler, Sentencing 6/1/06

Page 42

1  as directed by the probation officer.
2      You will comply with the standard conditions
3  adopted by the court and incorporated and described in the
4  guidelines. And you will comply with the following special
5  conditions: You prohibited from possessing a firearm,
6  destructive device or other dangerous weapon. You are to pay
7  the balance of the restitution amount in accordance with a
8  schedule I will establish if you can't pay it in full. You
9  will be prohibited from incurring new credit charges or opening
10  any additional lines of credit without the approval of
11  probation while any financial obligations remain outstanding.
12      You are to provide the probation office access to
13  any requested financial information, which probation may share
14  with the financial litigation unit of the U.S. Attorney's
15  Office.
16      You are to participate in a program for substance
17  abuse and counselling directed by the United States Probation
18  Office. That program may include testing not to exceed 104
19  tests per year as directed by the probation office.
20      I will also direct that you participate in mental
21  health counselling and the drug counselling, and I hope they
22  can be combined, mental health and drug counselling can be
23  combined; but, in any event, you'll be required to contribute
24  to the cost of such programs to the extent that you can do so
25  directly or through third-party payments.

Page 43

1      You are ordered to pay the special assessment of
2  $200 due immediately or in accordance with a payment schedule I
3  will establish.
4      May I ask probation, are there facilities of the
5  Bureau of Prisons where mental health counselling is available
6  for things like post-traumatic stress disorder?
7      PROBATION OFFICER: Yes, I'm sure there is, your
8  Honor. I'm not aware of which particular institutions at this
9  time.
10      THE COURT: I'm going to recommend to the Bureau of
11  Prisons that you be designated to a facility that provides both
12  the 500-hour program and mental health counselling, if they
13  exist. Primarily, however, my recommendation -- well, I won't
14  say anything further. I'm going to recommend that both
15  services be provided to you during your term of imprisonment.
16      Let me advise you, Mr. Sandler, that you can appeal
17  your conviction if you determine that your plea was somehow
18  involuntary or not knowingly made or if you think there is some
19  other defect in the proceeding not waved by your guilty plea.
20  You also have a right under certain circumstances to appeal the
21  sentence I've imposed on you, particularly if you think the
22  sentence is contrary to law. If you wish to appeal, you have
23  to file something called a notice of appeal, and there's a fee
24  for filing a notice of appeal. However, if you want to appeal
25  and you don't have the capacity to pay for the notice of

Page 44

1  appeal, you can inform the clerk of this court to that effect
2  and the clerk will prepare and file a notice of appeal on your
3  behalf.
4      Are there any questions?
5      PROBATION OFFICER: The only other thing I was
6  going to mention, your Honor, is that when the restitution
7  order is imposed, if your Honor should make it joint and
8  several with Todd Leccese's case.
9      THE COURT: And how about Mr. Muniz?
10      PROBATION OFFICER: Mr. Muniz I believe was charged
11  with totally different fires, but you could be more general and
12  just say that it's joint and several with any other defendants
13  that are convicted of the same crime.
14      THE COURT: All right. Perhaps you can supply me
15  with appropriate language.
16      PROBATION OFFICER: Yes, your Honor.
17      THE COURT: Okay. Thank you very much.
18      MS. BYRNE: Your Honor, I did want to just ask if I
19  could -- since we are -- since the judgment is actually not
20  going to be issued for three weeks, I would like to investigate
21  potential BOP prisons that might have the programs that you've
22  talked about, mental health treatments and the drug treatment.
23  So if I could submit a recommendation.
24      THE COURT: Yes.
25      MS. BYRNE: That the Court could put on the

Page 45

1  judgment.
2      THE COURT: Make a specific recommendation.
3      MS. BYRNE: Right.
4      THE COURT: I'd be happy to get that.
5      MS. BYRNE: Between now and then. Thank you, your
6  Honor.
7      THE COURT: Thank you.
8      (Court adjourned at 4:00 p.m.)
9          i i i i i i i
10          CERTIFICATION
11      I certify that the foregoing is a correct
12  transcript of the record of proceedings in the above;entitled
13  matter to the best of my skill and ability.
14
15
16
17
18  Debra M. Joyce          Date
19  Official Court Reporter
20
21
22
23
24
25

US v. Sandler, Sentencing 6/1/06

**A**

AA 37:17
ability 25:12 45:13
able 16:8 18:5 31:25,25
above;entitled 45:12
absence 29:5
abuse 17:5 24:17 42:17
abused 34:15
accept 37:2,20
acceptance 4:8
access 42:12
account 12:1 19:5
  28:12 29:18
accurate 6:20
Action 1:5
actions 33:4,18
activity 28:15,24
acts 26:18
actual 20:3
addict 16:2 33:4
addicted 33:19
addiction 11:25 16:17
  19:18,24 20:7 28:14
addicts 13:3,22
addition 27:10
additional 7:2 39:15
  42:10
address 33:15 41:10
addressed 19:20
adequate 18:25
adjourned 45:8
adjudications 38:20
adjustment 39:24
adopted 42:3
adult 38:20
advise 43:16
affect 8:18
afford 18:25
afternoon 3:12,14,15
age 19:4
ago 14:7
agree 7:21 8:2 25:14
  30:8
agreed 41:2
agreement 6:11 13:19
ahead 17:13 22:1
ain't 10:9
allow 6:17,20
amassed 27:5
AMERICA 1:3
amount 6:8,8,9,12,17
  7:1,13,25 8:8,14,16
  28:8 40:25 41:2,5,11
  42:7
and/or 20:3
angle 18:20
angry 32:20
answer 7:6,8,9,23 8:11

23:20 24:23 29:22
  39:13
anticipate 7:7
anybody 33:9 34:11,13
  37:6 38:7
anyway 16:1,11
apartment 26:15
apartments 31:16 40:1
apologize 37:3,8
apparent 22:9
apparently 13:14
appeal 8:9,10 43:16,20
  43:22,23,24,24 44:1
  44:2
APPEARANCES 2:1
appears 23:10
applied 34:1
appropriate 9:5 21:11
  21:21,23 28:10 40:10
  44:15
approval 42:10
approximately 26:17
  31:19
area 26:4
argument 18:8 22:19
  22:24 24:4 33:16,21
  34:5,25 40:9
arson 4:2 31:20
arsons 30:10
articulate 33:2
aside 39:20
asking 15:2,3,6 20:13
  20:23 22:3,7 27:24
assault 23:5 38:22
assess 22:24
assessment 5:11 22:11
  43:1
Assistant 2:3 3:8
assume 24:25
assuming 14:2
Atlantic 2:9
attempt 10:16 24:8
attempts 31:20
attention 19:25
attest 27:11
Attorney 2:3,4 3:8 41:9
Attorney's 42:14
auto 23:4
available 23:23 43:5
Avenue 2:9
aware 5:19 27:6 43:8

**B**

back 34:10 37:14,23
backed 34:9,9
background 16:20
  19:24 34:2
backgrounds 22:5
backlog 9:3,4

bad 10:5,7,9 37:4,5,7
balance 42:7
bank 34:21
bargain 14:13
Bargains 31:15
based 4:21 7:2 22:5,8
  30:3 31:3
bases 22:13 23:15
basically 35:1
basing 25:10
basis 22:16 24:9
beating 32:18
behalf 44:3
behavior 18:25
belaboring 23:1
believe 12:9 15:18
  28:10 31:20,21 37:3
  38:6 44:10
beneficial 23:24
benefit 29:2
best 29:15 45:13
better 23:22 24:8 39:8
big 35:20
biggest 15:7
bit 11:6 13:15
blaming 33:18
BOP 44:21
Boston 1:6,17,24 2:5
  2:10 3:6
break 40:7
breaking 23:6 38:22
briefly 5:18
Broadway 31:14
brought 12:6
building 26:15 31:16
  31:19,23,24 32:3
  35:24
buildings 14:20
bump 28:2
bureau 8:22 9:4 40:16
  40:19 43:5,10
burglary 23:4
burn 12:4,4,22 35:20
burned 27:17 31:23
business 13:1 20:3
  26:10 28:15
businesses 26:2,3,14,24
  27:16
businessman 12:20
businessmen 27:12
Byrne 2:9 3:15,16,18
  3:20,22,24 4:12,13
  5:4,5,15 7:19,20 9:10
  9:14,18,20 10:24
  11:3,8,13,19 12:15
  13:11 14:9,12 15:12
  15:15,18,21,23 16:1
  16:24 17:3,8,14,20
  17:22,25 18:5 19:10

20:10,25 21:21 22:3
  22:13 26:6,20 28:13
  33:11,12 36:23 44:18
  44:25 45:3,5
Byrne's 23:17

**C**

C 1:13 3:1,3
Cabell 2:3 3:12,13,19
  3:21 4:11 5:3,14,18
  6:24 7:6,10,12 8:11
  9:1 10:19 15:15
  20:25 21:3,9,15,17
  21:20 22:2,23 23:20
  24:3,15,22 25:7,21
  25:25 28:17,19 29:12
  29:22 30:19 33:13
  34:5,25 35:12 36:7
  37:14 38:15,19
call 39:14
called 43:23
calls 38:19
callus 26:11
campaign 28:20 29:8
  29:21 35:20
capacity 43:25
career 4:6,20,24,25
  11:20 14:24 19:19
  20:2 27:2,3,3,4,6,21
  27:25 34:18 35:1
  36:4,8,8,9,10,11,14
  36:17,18 38:19
carrying 23:7
case 5:21 6:2,6,15 7:13
  11:5,17 12:3,6 13:12
  18:7 20:21 21:2 22:6
  23:15 24:4 25:25
  26:4 28:11 34:22
  36:20 38:17 44:8
cases 14:19 19:11
  20:14 22:5 26:19
  34:17,21,22 35:6
category 4:17,19,21,23
  4:25 5:8 29:11
Catherine 2:9 3:15
caused 12:24 31:22
causing 26:13 32:15
certain 6:18 9:21 24:11
  39:17 43:20
certainly 30:24 34:7
  35:9
**CERTIFICATION**
  45:10
certify 45:11
cetera 20:7
Champagne 19:15,16
chance 17:16
change 41:10
changes 6:13

characteristics 33:24
characterize 39:15
characterized 16:25
charged 5:20 6:2 13:5
  21:10 30:13 36:1
  44:10
charges 35:25 42:9
charging 4:2
Chavez 19:15
checking 15:23
Chelsea 12:5,20 14:14
  26:4 27:12 31:14
  35:21
childhood 11:23 16:13
  17:4 23:16 39:19
  40:11
Children's 16:9
chooses 30:6,6
circumstance 41:14
circumstances 16:17
  20:7,13,16 22:9,25
  25:15,23 33:23 40:10
  43:20
cited 20:15 26:19 34:17
claims 5:23,24
classic 13:12
clear 26:21 34:23
clerk 3:9 10:3,22 41:7
  44:1,2
close 12:25 19:2
collect 6:7
collected 27:16
collecting 40:2
collection 41:25
combined 4:4 42:22,23
come 6:20 19:12 31:8
  34:11 37:23
comfort 6:7 39:3
comfortable 7:20 36:19
coming 32:20
commit 11:21 22:20
  23:14 25:14 27:21
  29:24 37:23 41:18
committed 26:18 28:5
  30:11 38:25 39:1,10
  40:16
committing 11:1
compared 15:7 35:10
competition 12:5,22
  14:14
complete 16:10
complicated 6:10
comply 28:9 41:17 42:2
  42:4
computation 4:10 5:1
concept 28:13
concern 10:1
concerned 38:13
concerted 26:2

conclude 22:17
concurrently 40:18,24
condition 39:21 40:12
conditions 41:17 42:2,5
conduct 19:1,18 23:9
  23:11 24:18 27:23
  31:4
conferred 9:13 17:12
connected 26:15
consequence 4:1
consider 28:12 33:22
  33:25 34:3 35:9,12
  35:13 39:14
consideration 25:8
  31:2 39:12
considered 30:1 34:6
  34:20
consistent 10:12
constellation 39:22
context 22:24
contrary 43:22
contribute 42:23
controlled 41:19,20
convicted 24:16 44:13
conviction 5:12 40:23
  43:17
convictions 4:22 23:4
  38:21,21
cooperated 13:7,18
copy 9:15,15
correct 7:8,9 15:21
  45:11
correctly 5:13
cost 42:24
counsel 3:8,11 9:13
  17:12
counselling 42:17,21
  42:21,22 43:5,12
count 40:18
counts 4:2,5 5:11 40:23
couple 33:13
course 4:24 13:17
  22:11 27:5,11 36:7
courses 37:17
court 1:1,14,22 3:2,4
  3:14,17,19,22,25
  4:12,14 5:4,6,16 6:1
  6:5,14,19,21,22 7:4,7
  7:8,11,14,16 8:4,19
  8:21 9:2,12,17,19,23
  9:25 10:9,11,20,23
  11:6,11,16,18 12:1
  12:13 13:9 14:6,11
  15:2,3,6,11,14,17,20
  15:25 16:22 17:2,9
  17:13,19,21,24 18:4
  18:21 19:5,8,12,13
  20:9,11,23,25 21:3,5
  21:11,12,13,18,22,25

22:1,3,7,13,16,21,25
  23:8,12,17,25 24:5,9
  24:14,21 25:17,24
  27:6,19,24 28:8,10
  28:18,20 29:13 30:8
  30:18 31:1,5,8,11
  32:9,12,16 33:7,9,22
  33:25 34:3,16 36:3,6
  36:21,23 38:11 40:15
  41:7 42:3 43:10 44:1
  44:9,14,17,24,25
  45:2,4,7,8,19
Courthouse 1:15,16,23
  1:23 2:4,5 3:5,6
co-defendant 12:2
create 29:24
credible 34:8
credit 42:9,10
crime 11:1 37:23 39:4
  41:18 44:13
crimes 11:21 22:20
  23:14 25:14 29:25
  38:21
criminal 1:5 3:9 4:15
  4:16,19,21,23 5:2,7
  18:25 19:1,18,19
  20:4 23:2,9 27:5,7
  28:15,16,18,24 29:2
  29:4,5,11,17 30:3,7
  30:15 35:18 38:19,23
CRR 1:22
culpability 20:4
culpable 12:2
custody 40:16
cuts 26:7

_____

D

D 2:3 3:1
damage 14:21 26:13,17
damaged 14:20
damages 6:8,12
danger 36:2 39:11
dangerous 23:7 38:22
  42:6
dangerousness 23:10
dastardly 39:21
date 9:21 10:18 34:10
  45:18
David 20:5
Davidoff 16:15 18:10
day 37:14
days 41:10,22
daytime 23:7
deal 8:2,5 29:15
dealing 6:5 33:5
dealt 13:17
Debra 1:22 45:18
debt 32:18
decided 12:21

deems 21:11
defect 43:19
defendant 1:6 2:7 3:7
  9:13 17:6,10,12 20:6
  22:25 23:3 24:6
  33:24 36:25 37:2
  38:9
defendants 6:19 22:4
  29:24 30:3 44:12
defendant's 22:9 23:16
  34:1
Defender's 2:8
defense 13:17
definitely 13:18 33:15
definition 6:13
degree 23:5
delaying 9:8
deliberate 27:1
demonstrate 24:6
demonstrates 26:10
depart 22:13 23:15
departed 19:13,16
department 14:23 32:1
  39:24
departure 10:24 22:5
  40:4
departures 34:18,19,20
  36:5
depend 6:13
depression 11:25 16:14
depressive 19:23
depth 22:15
described 28:12 33:3
  42:3
designated 9:4 43:11
designation 8:23 9:8
  11:19
desperate 13:2
destruction 28:21
destructive 42:6
details 17:23
determination 4:5,20
  39:7
determine 4:3 43:17
determined 4:4,19 7:1
  7:14 14:23 41:1
determining 28:11 31:3
deterred 39:4
deterrence 18:25 25:18
  25:20,21,22
developed 20:7
development 31:17
device 42:6
devised 14:14
diagnosed 16:3,11
  23:22 25:12
dictated 32:24
difference 23:18 25:3
  29:6 30:5 38:13,15

39:6
different 5:22,23 24:1
  30:14 31:1 44:11
difficult 5:21 18:1
  24:23
direct 42:20
directed 42:1,17,19
directly 4:16 42:25
dirty 13:23
discern 29:18
discussed 18:8
Discussion 9:24 10:10
  21:8 37:1
disorder 11:25 16:3,12
  16:24 19:23 43:6
disparity 14:1 18:9
  20:18
disregard 26:11
disrupt 26:2
distribution 23:5
district 1:1,1,14 3:4,4,4
  34:18 36:5,15 41:10
DNA 41:25
docket 8:14
doctor's 34:8
documented 18:2
documents 6:7 16:7
doing 12:21 26:11 32:7
dollars 14:17 26:6,7,12
Donald 2:3 3:12
Doug's 31:14
downplay 30:9
Dr 16:15 18:10
drive 26:3
driven 29:10,10 30:15
drug 13:2,22 18:21
  23:4,5 26:21 28:14
  33:3 37:17 40:20
  41:21 42:21,22 44:22
drugs 33:19 37:4
DSM 16:25 17:1
due 43:2
DYS 16:9

_____

E

E 3:1,1
easily 27:8 39:4
effect 7:1 9:8 20:2 44:1
effort 6:6 24:19 26:2,4
  40:2
eight 15:5
elaborate 11:6
elderly 31:18 32:3
eliminate 14:14 26:3
ended 22:3
enforcement 27:12
engages 28:21,25
enhancement 4:6,7,24
  20:3

enter 8:13 10:6,13,17
entered 4:1 7:15 10:4
  10:15
entering 8:5 23:6 38:22
entirely 30:15
entry 41:1
equally 30:2
escalation 23:10
especially 5:21 35:19
  39:10,21 40:1
ESQ 2:3,9
essence 22:19
essentially 23:20 26:1
establish 41:6 42:8
  43:3
estimate 6:2
et 20:7
evaluated 16:16
evaluation 16:4,4
event 4:18 42:23
everybody 6:7 12:14
evidence 34:9
exact 9:15
example 8:9 19:15,21
exceed 41:23 42:18
excessive 20:3
excuse 21:1 33:20
  37:10 38:1
executed 12:23
exist 43:13
expect 18:14
expert 24:1,24
explained 37:12
explicit 30:2
extensive 16:4
extent 42:24
extra 25:4
extraordinarily 11:23
extremely 16:13 17:4
  17:15

_____

F

face 11:5 29:3 30:21
faced 11:5
facilities 43:4
facility 9:5,9 43:11
facing 13:14 14:25 15:1
fact 4:22 6:9,10 24:7
  28:5 29:19 30:14,14
  30:16,21,22 33:18,19
  33:22 34:23 35:23
  36:10 39:18,20
factor 13:24 39:16
factors 12:1 25:8,17
  34:19
facts 14:4
fair 23:8
fairness 14:1
fallacy 24:3

**families** 31:18
**far** 12:2 27:9 30:6
**federal** 2:8 9:5,9 41:18
**fee** 22:11 43:23
**figure** 6:4,18,21 7:2
  40:3
**file** 43:23 44:2
**filing** 43:24
**final** 6:4 8:10
**financial** 22:9 41:14
  42:11,13,14
**fine** 9:14 22:10 41:13
**fines** 5:10
**finite** 8:19
**fire** 26:7 28:20 31:23
  32:1,4 35:24
**firearm** 42:5
**firefighters** 39:25
**fires** 5:20 6:3 12:3,6,24
  13:5,21 14:15,18,21
  21:10 28:3,4,5 29:8
  32:6,7,15,23 44:11
**first** 4:2 6:19 7:18
  11:19 14:6 21:7,19
  21:24 22:12,14 32:6
  33:14 34:4,14 37:2
  39:25
**five** 17:17 32:1
**fix** 26:21
**Floor** 2:9
**folks** 37:23
**follow** 29:21
**followed** 22:8
**following** 3:2 21:24
  40:21 41:17,21,22
  42:4
**follows** 26:1
**foot** 29:14,19
**foregoing** 45:11
**fortunately** 14:22
**forum** 6:13
**forums** 5:23
**forward** 7:24 32:5,20
**four** 13:20 28:4 37:21
**frankly** 39:7
**free** 13:9
**fresh** 14:4
**front** 6:15,24 15:13
**full** 42:8
**further** 6:10 18:24
  43:14
**future** 8:1 11:2 23:19
  39:4

**G**

**G** 3:1
**geared** 31:17
**general** 22:24 23:13
  25:18 29:14 44:11

**generally** 30:20
**Gertner** 19:23
**getting** 9:4 13:18 29:15
**give** 13:1 18:16,18
  27:13 39:3 40:7
**given** 20:16 36:12,15
**gives** 25:19,20
**giving** 27:17
**Glavin** 20:5
**go** 7:24 10:13 13:9,10
  14:3,5 17:13,15,22
  21:24 22:1 24:7
  26:25 37:13
**going** 7:7 8:15,18 11:9
  12:7,21 13:13,19
  18:7 20:21 21:20
  22:10,19,20 24:5,7
  25:14,15 30:22,25
  35:4,5,10,13,15,17
  37:21,23,24 38:3
  39:14 40:4,4,7,8
  41:15 43:10,14 44:6
  44:20
**good** 3:12,14,15,18
  18:11,22 37:8,12
  38:4
**goods** 14:13
**gotten** 20:22 22:4
**government** 2:2 3:13
  6:18,20 13:7
**government's** 21:22
**grand** 23:4
**grant** 40:4
**greater** 11:16
**grew** 20:6
**grown** 37:10
**guard** 23:6
**guess** 4:19 10:1 12:13
**guideline** 5:1 13:14
  34:20 36:6,12,15
**guidelines** 5:8 20:20
  27:4,6 28:2 36:18
  40:5,6,13 42:4
**guilty** 6:3 43:19
**guy** 12:16,17,20 13:6
  13:14 35:14
**guys** 29:19 37:3 38:5

**H**

**half** 25:3,4,7,19 29:7
  35:16 39:6,13
**hand** 26:8,10
**handicapped** 31:18
  32:2
**happen** 8:1 24:5 35:10
  37:24
**happened** 14:8 29:1
  37:10 40:3,3
**happening** 35:6

**happy** 7:17 8:21 9:6
  14:9 45:4
**harmony** 30:2
**havoc** 26:13
**head** 37:24
**health** 18:19 19:17,19
  34:5,7 35:2 42:21,22
  43:5,12 44:22
**hear** 21:15,15,18,23
**heard** 33:10 37:13 39:9
**hearing** 33:3
**heart** 37:24
**held** 3:2
**help** 35:4 37:13,16 38:8
**helped** 32:2
**helpful** 14:7 18:23
**helping** 11:15
**heroin** 11:25 16:2,16
  19:24 20:7
**Hi** 3:17
**higher** 18:18 40:9
**highest** 27:7
**hired** 12:16 13:2
**hiring** 13:22
**history** 4:15,16,19,21
  4:23 5:2,8 20:4 23:2
  23:9 27:5,7 28:14,16
  28:18 29:5,11,17
  33:23,24 34:2 38:19
  38:23 39:2
**honestly** 38:6
**Honor** 3:12,15,18,21
  3:24 4:11,13 5:3,5,14
  5:15,18 7:12,20 8:12
  9:11,14,20 11:3,8,9
  11:14,19 12:4 13:7
  13:25 14:2,19,24
  15:2,6,10,19 16:3,19
  17:1,8,14 18:7,22,24
  19:2,10,12,21 20:10
  20:16,23 21:1,9 22:6
  22:23 25:21,25 27:19
  30:17 33:12 34:12,21
  35:7,9,22 36:2,13,19
  37:18 43:8 44:6,7,16
  44:18 45:6
**Honorable** 1:13 3:3
**hope** 42:21
**hospital** 16:9 34:9
**hour** 40:19
**Hourihan** 9:25 10:3
**housing** 31:17,17
**hundred** 14:17 26:6,7
  26:12
**hurt** 37:5,6,9 38:7

**I**

**identify** 32:23
**ignore** 39:11

**illegal** 41:19
**illness** 11:24 16:18,22
  16:23,25
**immediately** 8:7,7 41:6
  43:2
**impact** 23:24
**impairment** 25:2
**impede** 32:25
**implicate** 27:18
**imply** 33:17 34:17
**important** 13:24 19:7
  30:2 34:2
**impose** 6:16 18:15 22:3
  22:7 27:25 28:8
  36:21 41:13
**imposed** 8:18 28:6
  38:24 43:21 44:7
**imprisoned** 40:17
**imprisonment** 5:9
  40:21 43:15
**incarceration** 11:22
**include** 42:18
**including** 16:8 38:21
  39:22
**incorporated** 42:3
**increase** 28:2
**incurring** 42:9
**indefinitely** 8:20
**independent** 23:3
**indictment** 4:1
**indictments** 12:14
**individual** 12:7,11
  38:12
**individuals** 5:19 12:16
  38:15
**inferno** 31:22
**inferring** 24:17
**inform** 44:1
**information** 18:1 27:14
  27:15,17 32:6,22
  42:13
**initially** 32:23
**initiated** 12:3
**injured** 14:21
**injustice** 20:18
**inside** 31:23,23
**instance** 26:19
**instances** 26:23
**institution** 37:13
**institutions** 43:8
**intelligent** 33:1
**intend** 33:16
**intention** 33:20
**interfered** 31:24
**interim** 14:8
**interrupt** 21:2
**investigate** 36:4 44:20
**investigating** 27:11
**involuntary** 43:18

**involved** 5:22 20:21
  31:12 32:17 36:1
**issue** 5:16,20,21 6:5,6
  6:12 11:4 22:10
**issued** 6:25 44:20
**issues** 6:10 19:18,20
  35:2
**item** 4:15

**J**

**J** 1:15,23 2:4 3:5
**jail** 37:15
**job** 34:21
**John** 1:15,23 2:4 3:5
**joint** 44:7,12
**joke** 37:17
**Jose** 6:15 15:12
**Joyce** 1:22 45:18
**Judge** 3:4 6:16,25 9:16
  12:12,15,18 13:20
  15:10 19:16,23 20:1
  20:5,8
**judges** 19:13,13
**judgment** 6:22,25 7:4,4
  8:6,8,9,14,23 9:16
  10:4,5,14,17 15:12
  40:15 41:1 44:19
  45:1
**judicial** 24:18
**July** 14:18 31:22
**June** 1:6 3:6 9:23 10:23
  14:18 41:3
**justice** 14:1
**Justin** 20:8
**juvenile** 38:20,20

**K**

**K** 2:9
**keep** 13:24
**key** 25:2
**kind** 10:14 12:16 37:8
**know** 4:14 7:17,23 8:22
  9:6,8 10:12 12:20,20
  14:3,6 15:4 16:25
  17:16 21:22 23:13,21
  24:5 28:16 33:1 34:6
  34:13 35:4,16,16
  37:11,14,18,19,20,24
  38:3,4,9,17
**knowingly** 43:18
**knows** 13:7 14:24
  18:22 30:21

**L**

**laid** 19:11
**language** 9:15 44:15
**larger** 6:6 30:25
**law** 27:12 33:25 35:6
  43:22

**lawyer** 35:14 37:12
**lays** 22:14
**learning** 10:2
**leave** 12:24
**leaves** 8:6
**Leccese** 12:11,16,18,19
  13:6 14:12,17 15:8
  18:9 26:8,24 30:5,9
  30:19,25 31:2 35:10
  35:19 38:14
**Leccese's** 29:5 35:25
  38:17 44:8
**led** 11:25 19:18
**left** 7:5,5 8:8
**lengthy** 16:6
**lesser** 30:6
**let's** 15:7 25:17
**level** 4:3,5,6,7,8,9,10
  4:21 5:7 6:8
**levels** 4:8
**liability** 6:12
**life** 34:14 37:21
**likelihood** 11:1,21
  18:13 19:3 20:17
  25:14
**limit** 9:21
**Lindsay** 1:13 3:3
**lines** 42:10
**listening** 39:7
**literal** 27:3
**litigate** 7:25
**litigated** 6:11
**litigation** 5:24 42:14
**little** 11:6 13:15
**lived** 40:1
**local** 41:18
**long** 8:19 12:23 28:14
  39:5,5
**longest** 38:24
**look** 10:5,7
**looked** 38:23
**looking** 10:3,8 13:20
  19:1 34:13
**looks** 10:9
**lot** 12:24 14:8 18:1,2
  37:8
**low** 13:14,16 20:20
  24:2 27:25 40:8,9,13
**lower** 18:13 19:4 20:17
  29:3 35:1
**lowering** 24:25
**low-income** 31:17,18
**luck** 28:22
**Luckily** 31:25

---

**M**

**M** 1:22 45:18
**MA** 1:17,24 2:5,10
**mailing** 41:10

**making** 10:4 34:25
**man** 19:2 37:10 38:6
**mandatory** 5:11
**Massachusetts** 1:1,6
  3:5,6
**mastermind** 28:25 29:1
  29:7,8
**masterminded** 26:9
**masterminds** 28:20
**materials** 7:2 8:15
**matter** 8:5 30:17 31:12
  33:19 45:13
**ma'am** 9:12
**McDonald's** 26:17
**mean** 8:7 16:22 33:19
**meaning** 32:10
**means** 14:25
**meant** 37:5 38:6
**mediation** 5:25
**meeted** 24:20
**meeting** 32:25
**meetings** 16:7
**memo** 13:16 14:3 18:8
  19:11
**memorandum** 12:10
**memory** 14:4
**mental** 11:24 16:18,22
  16:23,25 18:19 19:17
  19:19 34:5,7 35:2
  40:12 42:20,22 43:5
  43:12 44:22
**mention** 44:6
**message** 27:20
**met** 27:15 32:6,22,24
**methodical** 27:1
**mic** 11:10
**microphone** 31:9
**mind** 7:16 11:9 13:25
**minimizing** 28:23
**minimum** 28:4
**minnows** 13:9
**minute** 17:8
**minutes** 17:17 32:1
**miserable** 20:6
**misspeak** 15:24
**Moakley** 1:15,23 2:4
  3:5
**moment** 9:10 19:6
**money** 26:5,22 27:16
  32:24 35:15 40:2
**moniker** 27:21
**months** 5:9 6:5,16
  13:15,16 15:1,1,3,6,7
  15:8,8,9,9,18 19:16
  19:17,22,22 20:1,2,5
  20:5,24 22:7 28:1,6,8
  32:5 35:2 40:17,18
**motion** 4:16 10:24
**move** 32:25

**multiple** 27:22 28:3,5
  29:8,9
**mumble** 37:8
**mumbler** 37:19
**mumbling** 37:19
**Muniz** 6:15 7:13 12:17
  15:10,11,12 44:9,10

---

**N**

**N** 3:1
**name** 3:11 31:12,13
**national** 10:8
**nature** 35:22 33:23
**necessary** 6:7 11:17
  39:23
**need** 7:18 8:19 18:24
  27:22
**needed** 26:21
**needs** 18:14 27:20 28:6
**neglect** 19:7
**neglected** 34:15
**never** 16:11,14 19:25
  35:1,4 37:5,6,9 38:6
**new** 10:2 42:9
**nine** 27:8
**note** 23:2 27:24 30:23
**noted** 29:23
**notice** 43:23,24,25 44:2
**notify** 41:9
**notion** 30:2
**no-job** 26:22
**number** 4:22 5:22 7:5
  26:23 37:25 39:10
**numerous** 16:6

---

**O**

**O** 3:1
**objected** 4:15
**objection** 4:10,12,14
  5:1
**objections** 13:17
**obligations** 42:11
**observation** 33:1
**obviously** 7:25 35:13
**occasions** 26:23
**occupants** 31:19
**occur** 20:18
**occurred** 14:18 35:25
**occurs** 41:4,11
**offender** 4:6,20,24,25
  11:20 14:24 19:19
  20:2 27:2,3,3,4,21,25
  35:1 36:4,8,9,17,18
  38:20
**offenders** 34:18 36:9
  36:11,12,14
**offense** 4:3,5,6,7,8,9,10
  4:21 5:7 25:23 28:12
  33:23 39:1,8,9,22

40:10
**offenses** 23:8 24:16
  27:11,22
**offering** 27:13
**office** 2:4,8 6:1 42:12
  42:15,18,19
**officer** 4:4,18 15:22
  42:1 43:7 44:5,10,16
**Official** 1:22 45:19
**officials** 27:12
**Oh** 10:20
**Okay** 6:22 7:11,16 9:19
  10:11,13 11:6,18
  15:20,25 17:2,24
  18:4 19:8 21:13 22:2
  31:10 32:16 33:11
  44:17
**old** 16:1 19:3 34:10
**older** 22:20,22 23:14
**ones** 29:20 35:25
**ongoing** 12:7
**open** 3:2 7:5,5 8:6,8,20
**opening** 37:9
**opinion** 24:23
**opportunities** 24:12
**opportunity** 7:25 24:6
  38:10
**opposed** 30:13
**order** 6:16 7:14,22 10:6
  10:14,14 26:22 30:23
  40:25 41:5 44:7
**ordered** 43:1
**outcast** 28:24
**outcasts** 28:23,23
**outlook** 18:11
**outrageous** 20:12
**outstanding** 10:5 42:11
**overall** 31:19 33:1
**overlook** 39:19
**overrepresents** 11:20
**owner** 12:19 14:13
  31:14
**owners** 21:10 26:14

---

**P**

**P** 3:1
**pages** 17:18,18 19:10
**paid** 14:17 19:25 32:19
  32:21,24 41:5
**parcel** 23:9
**parents** 38:1
**part** 18:15,19 22:12
  23:8 24:18 25:8 28:1
  29:1,16 30:1
**participate** 18:22 35:5
  40:19 42:16,20
**particular** 26:14 43:8
**particularly** 17:18 20:6
  43:21

**parties** 7:3 10:16 11:5
**Paul** 31:13
**Pause** 19:9
**pay** 35:15,15 41:15
  42:6,8 43:1,25
**payment** 43:2
**payments** 41:7 42:25
**pending** 12:12 13:19
**people** 9:4 12:24 13:22
  20:14,21 23:13 27:16
  28:21 29:20 32:2
  35:8,21,21 36:2,17
  39:25
**percent** 36:17
**performed** 16:6
**period** 6:18 8:19,24
  10:15,17 12:6,23
  14:15 36:10 39:1
**periodic** 41:22
**periods** 13:1
**person** 26:9 28:15,16
  32:15,23 33:2,5
  34:16
**personally** 21:6
**pertaining** 16:9
**physically** 30:12 34:15
**pick** 11:10
**picture** 29:13 39:8
**place** 37:4,7
**placed** 40:22
**places** 4:24 30:15
**plain** 13:1
**Plaintiff** 1:4
**plan** 12:4,23 14:14,16
  29:20
**planned** 12:3
**plea** 4:1 13:18 43:17,19
**pleads** 29:9
**please** 3:11 21:4 31:9
  36:25 40:14
**pled** 6:3 30:12,13
**Plymouth** 8:24
**podium** 11:11 31:8
**point** 19:10 20:11
  21:11 23:13 29:21
  30:18 33:3 34:4
  35:23
**pointed** 38:16
**points** 4:23 11:14 16:15
  16:20 27:5,8,8 33:13
**police** 32:25
**portion** 41:11
**posed** 27:14
**positions** 31:1
**possess** 41:19
**possessing** 42:5
**possession** 23:5
**possible** 8:12
**posted** 32:4

**post-traumatic** 11:24
  16:3,12,24 43:6
**potential** 23:10 44:21
**potentially** 26:16
**predict** 39:3
**prejudice** 9:7
**prejudices** 8:16
**prepare** 44:2
**prepared** 7:24
**present** 3:7,8 23:8
  30:12 33:9
**presented** 24:4
**presentence** 3:20 23:1
**Presumably** 36:16
**presume** 24:10,11,14
**primarily** 10:25 11:3
  43:13
**principle** 29:24
**principles** 28:9
**prior** 12:5
**priority** 37:25
**prison** 13:21 22:7,18
**prisons** 8:22 9:4 40:16
  43:5,11 44:21
**private** 35:14
**probably** 18:5 35:16
**probation** 4:4,18 6:1
  6:19 14:23 15:22,24
  39:24 42:1,11,12,13
  42:17,19 43:4,7 44:5
  44:10,16
**problem** 26:21
**problems** 24:17 34:6,7
  40:11
**procedure** 8:5
**proceeding** 43:19
**proceedings** 3:2 45:12
**process** 38:12,13
**program** 18:21,23
  40:20 42:16,18 43:12
**programs** 37:12,17
  42:24 44:21
**prohibited** 42:5,9
**properly** 23:22
**properties** 5:22
**property** 21:10 26:14
  31:20
**proposition** 23:18
  25:11
**prosecuted** 24:15 26:20
**provide** 5:8 24:19
  39:13 40:6 42:12
**provided** 9:22 23:19
  32:22 43:15
**provides** 43:11
**psychiatrist** 23:25
**psychological** 25:1
**psychologist** 16:5,16
**pull** 26:22

**punishment** 24:20
**put** 26:16 37:4,4,11,11
  39:11,19 44:25
**putting** 36:2 39:24
**p.m** 1:6 45:8

_____

**Q**

**qualified** 16:5 30:1
**qualifies** 14:24
**quarter** 35:16
**question** 7:17 10:16,25
  14:20 24:23,25 25:1
  25:2 35:11
**questions** 44:4
**quickly** 32:2
**quirk** 28:1
**quite** 18:11

_____

**R**

**R** 3:1
**ramifications** 26:11
**range** 5:9 14:25 19:4
  27:25 28:3,3 30:20
**reach** 11:16 27:7,7
**read** 3:20 17:16 34:8
**real** 25:2
**really** 13:11 29:19
**reason** 28:7 29:23 30:5
  32:20
**reasonable** 15:5 20:13
  25:5,6,11,16 29:18
  40:6
**reasons** 20:23
**receive** 12:7 20:19
  24:12 27:22 29:25
  30:3,6,22 31:2,3
**received** 15:10
**recidivate** 22:17,22
**recidivism** 18:13 19:3
  20:17 22:14 24:2,25
  25:10
**recognition** 40:11
**recognize** 29:16
**recognizing** 22:2
**recommend** 18:21
  40:19 43:10,14
**recommendation** 21:22
  43:13 44:23 45:2
**record** 3:11 7:12 9:24
  10:10 19:19 20:17
  21:8 22:16 23:12
  24:10 29:2,4 30:7
  35:18 37:1 45:12
**records** 16:8 34:9
**reduced** 4:8
**referred** 12:18 35:7
**reflect** 28:5
**reflects** 20:18 25:8

27:23
**refrain** 41:20
**regarding** 5:16 11:15
**regardless** 8:17 37:10
**Reginald** 1:13 3:3
**release** 5:10 11:21
  18:18 22:8 39:2
  40:21,22 41:16,21,22
**released** 19:3 22:18
**relieved** 39:18
**remain** 8:20 42:11
**remains** 41:11
**repeat** 30:16,16,16
**report** 3:20 23:1 34:8
**Reporter** 1:22 45:19
**represent** 6:4,4
**represented** 19:15
**representing** 3:16
**requested** 36:22 42:13
**requesting** 18:17 20:12
**required** 41:15 42:23
**requires** 39:12
**residential** 40:20
**residents** 35:24
**resolution** 41:3
**resolve** 10:16
**resolved** 22:10
**respect** 28:13 30:24,25
**respond** 21:21 22:12
  23:17 33:12
**responders** 39:25
**response** 24:18
**responsibility** 4:9
  33:17 37:3,20
**responsible** 7:23 30:11
  33:4 35:20
**rest** 25:8
**restitution** 5:17,21,23
  6:6,13,17 7:1,13,22
  7:22 10:16 22:10
  30:23 35:15 40:25
  41:2,5,11,14 42:7
  44:6
**result** 14:21 16:12,17
  17:3 19:24
**resulted** 11:24
**resulting** 4:9 19:18
**results** 4:22
**review** 14:6 17:18
**reviewed** 16:7
**reward** 32:4
**rewards** 27:13
**right** 3:19 4:14 5:6,7
  10:23 12:15 17:13,25
  20:9 24:21 25:25
  26:8 29:12 35:19
  37:19,21 43:20 44:14
  45:3
**risk** 22:14 24:2,24

25:10 26:16 39:25
**RMR** 1:22
**robbery** 34:21
**role** 15:15
**Room** 1:23
**Rugo** 21:1,4,7,9,14,16
  21:18,24 27:10,15
  31:6,7,10,13,18
  32:10,14,17 33:7,8
  33:15 35:21 38:8,10
  39:8,9,16 40:2

_____

**S**

**S** 3:1
**sample** 41:25
**Sandler** 1:6,12 3:7,10
  3:16,23,25 4:24 6:3
  7:21 8:9,17,22 9:7
  12:5,17 13:4,23,25
  14:16,23 16:1,7,10
  16:11 18:11 20:15,24
  22:17 23:19 24:12,24
  26:5,12,23,25 27:8
  27:14 28:2,14,21
  29:3,8 30:7,13,24
  31:3 32:5 33:17
  34:10 35:11,17,18
  36:7,24 38:14,18
  39:16,18 40:5,7,14
  40:15 41:16 43:16
**Sandler's** 11:1,15 17:5
  29:4 34:22 39:2
  41:13
**saying** 3:25 32:5
**says** 10:4,14 24:1
**scene** 13:4
**schedule** 41:6 42:8 43:2
**scorable** 4:22
**seamless** 23:9
**seat** 21:14
**second** 40:2
**section** 18:8
**security** 23:6
**see** 38:23
**seeking** 22:9
**send** 27:20
**sentence** 8:6,17 10:25
  11:15,16,17 12:8,11
  15:7,17,18 17:6
  18:15,16,17,25 19:2
  20:19,24 22:4 25:5,5
  25:6 27:22,24 28:6
  28:11 29:3,9,10,18
  30:7 35:1,17 36:10
  36:13,17,20,21 38:12
  38:24 39:2,5,5 40:5,8
  40:9,12 43:21,22
**sentenced** 6:15 17:10
  30:22 36:8,11,12,14

36:18
**sentences** 11:4 20:20
  30:1,3 34:19 36:4,6
  36:16
**sentencing** 1:12 7:24
  12:10 13:16,25 14:3
  18:8 19:11 34:1 35:8
**separate** 7:14 23:4
**serious** 39:12
**seriousness** 27:23
**serve** 35:17
**served** 40:18,24
**services** 43:15
**set** 6:17 14:15,17 25:9
**seven** 15:5 31:20
**severely** 35:2
**share** 42:13
**sharks** 13:9
**shark-minnow** 28:13
**Shawn** 1:6,12 3:7,10,16
  32:5,14,18 38:8
**short** 7:6,9 8:16 39:1
**shorter** 12:8
**shot** 23:6
**signed** 13:19
**significant** 11:4 16:20
  28:1 31:22
**significantly** 11:20
  12:8 19:14
**similar** 19:14,17 20:1
  29:25,25 34:22
**similarly** 12:17 15:9
  19:23 27:20 35:9
**simple** 30:17,19
**simply** 6:25 8:13 22:16
  23:1 24:5,9,17
**sir** 31:7 32:9
**sit** 25:13
**situated** 12:17 15:10
  27:20 35:9
**situation** 13:12,13
  14:12 19:17 20:1
  23:23 36:1
**situations** 19:14
**Six** 36:12
**Sixteen** 38:20
**skill** 45:13
**slightly** 12:10
**Smith** 19:22
**sociopathy** 39:17
**soldiers** 29:14,19
**solicited** 14:17
**solution** 8:12 9:6
**somebody** 7:17 23:22
  26:21 27:2,4,14
  28:25 32:18
**son** 37:21,24
**sorry** 10:20 15:23 21:1
**span** 23:2

spare 9:17
speak 5:18 15:15 17:9
  21:7,12 31:9
speaking 30:20 37:11
special 5:11 22:11 42:4
  43:1
specially 39:23
specific 6:17 22:24
  24:22 25:18,22 45:2
speculation 23:21
spot 37:5
stairwell 31:23
stand 11:10,10,11
  40:14
standard 42:2
stands 30:6
start 3:25 8:25 31:11
  32:12
state 3:11 41:18
stated 5:13
statements 21:24
States 1:1,3,14 2:3,4
  3:3,4,5,8,9 41:9
  42:17
statistical 23:13
statistics 10:8
status 5:24
Stearns 6:16,25 9:16
  12:15 15:10 20:8
step 4:2
store 12:19 14:13
stress 11:24 16:3,12,24
  43:6
strive 37:22
studies 22:21
stuff 13:21
submissions 5:25
submit 6:18,21 8:15,15
  41:21,25 44:23
submitted 7:2
substance 24:16 41:19
  41:20 42:16
substantial 38:18
substantially 29:3
  30:25
suffering 19:23
sufficient 11:16
suggest 18:16 26:7
  35:12
suggesting 24:9 36:7
Suite 2:5
summarizes 23:3
supervised 5:9 18:18
  22:8 40:22 41:16
supply 44:14
supposed 32:19
sure 8:4 9:3 10:8 19:6
  38:25 43:7
surrounding 39:22

suspend 41:1
sustained 26:17
system 24:18

——— T ———
take 4:3 12:1 17:17
  19:5 25:17 28:11
  29:13,18 30:18 31:2
talked 22:15 26:24,24
  39:24 44:22
talking 23:21 25:18
  28:24 31:21
target 26:25
targeted 26:15
Teal 20:8
tell 10:3,7 36:3,6
telling 31:11
temporary 10:14
ten 15:6 25:3,15 27:9
  36:20 39:5,6,13
tenants 26:16 31:24
ten-year 18:17 19:1
  36:21
term 5:8 7:5 8:6 22:7
  40:17,17,22,23 43:15
terms 13:25 18:7,24
  24:22 32:24 35:8
  36:2 41:17
terrible 39:18
test 41:21
testing 42:18
tests 16:6 41:23,23
  42:19
thank 11:13 20:10,25
  21:16,17 31:5 33:7,8
  36:23 38:5,11 44:17
  45:5,7
Thankfully 32:1
theft 23:4
thing 8:2 10:11 36:3
  44:5
things 10:2 14:8 18:2
  18:10 43:6
think 6:25 7:6,10,18,19
  8:16,22 12:25 13:11
  13:15,24 15:4 16:24
  17:9 20:2 21:20,23
  23:7,20 25:10 27:19
  28:7 29:22 31:1 33:6
  37:23 39:12,17 40:6
  40:8 43:18,21
third 2:9 23:5
third-party 42:25
thought 4:20 35:11
three 4:8 5:10,19 8:13
  9:1,2 10:6,18 11:14
  12:2 13:20 18:18
  22:8 28:4 30:12
  34:10 35:25 36:2

40:22,23 44:20
three-week 9:21 10:15
throw 37:15
time 6:18,20 8:14,16
  9:8 12:23 13:1 20:14
  25:20 28:6,8 32:6,22
  32:24 38:5 43:9
times 29:7
today 8:12 9:23 31:22
Todd 12:11,18 44:8
told 32:7,14
Tony 19:22
total 4:9,23 5:12 28:7
totally 44:11
tragic 35:14
transcript 1:12 45:12
transferred 41:8
traumatic 11:23 16:13
  17:3,4,15 19:24 35:3
treated 16:12,14,19
  19:20,25
treatment 18:12,12,12
  18:19,20,21 23:19,23
  24:1,2,7,13,19,24
  25:13 34:14 35:4
  38:14 40:20 44:22
treatments 44:22
tried 38:8
true 6:4 22:23 27:2,2,4
  34:12 38:19
try 37:13
trying 30:9 35:12,20
  40:3
Twenty-six 36:15
twice 39:16
two 4:2,5 5:10 8:13,25
  9:1,2 11:23 13:4
  14:16 16:6 25:4,7,19
  28:4 29:6,6,9 30:13
  32:5 38:24 41:22
twos 29:20
two-year 12:6 14:15
types 29:25,25
typical 34:16

——— U ———
underestimated 12:10
  13:15
understand 25:24
understanding 12:9
understands 7:21
underwent 16:18 17:5
  34:13
undiagnosed 25:1,11
  39:20 40:12
undue 20:3
unfair 35:14
unit 42:14
United 1:1,3,14 2:3,4

3:3,4,5,8,9 41:9
  42:17
unlawful 41:20
unpaid 41:12
untreated 35:3 39:20
unusually 16:13
upbringing 35:3
urging 22:13
use 41:20
Usually 8:1
U.S 1:15,23 2:4 42:14

——— V ———
v 1:5 3:9
vacuum 25:9
variances 34:20 36:5
various 13:1
versus 15:8,9 20:20
VI 4:19,21,23,25 5:8
victim 21:2 39:16
victims 39:11,23 41:8
view 8:11 11:7 16:17
  23:8,13
violence 27:22
violent 38:21
vulnerable 39:10,23
  40:1

——— W ———
waited 8:13
want 7:24 9:6,15 14:3,4
  14:10,10,11 15:24
  17:10,14,22 18:9
  19:6 20:10 21:6,15
  21:18 33:12,14 34:23
  38:1 39:15 43:24
  44:18
wanted 8:9 21:21 36:3
  37:6,9
wants 18:22 23:22
wasn't 37:6
water 14:21
waved 43:19
way 1:16,23 2:5 3:6
  12:14,19,22 13:2
  18:3 33:16,18 35:23
ways 26:8
weakness 24:3
weapon 23:7 38:22
  42:6
weeks 8:13,13,25 9:1,2
  10:6,18 44:20
well-established 26:3
well-motivated 33:2
well-noted 24:17
went 12:14 27:9
we'll 8:2
we're 15:5 17:1 19:1
  22:6,9 25:9,9 27:24

28:23 31:21
whatnot 37:12
whichever 34:20 41:3
willing 18:14
wish 33:11 43:22
wishes 21:25 33:10
Wolf 12:12,18 13:20
  20:5
words 6:25 37:8
work 8:23 13:3,23
  32:17
worked 32:7,10,14
working 31:18
works 13:8
worse 34:23
wouldn't 37:7
wreak 26:12
wreaked 26:13

——— Y ———
year 41:23,24 42:19
years 5:10 13:21,22
  14:16 15:5,6 16:1,2
  18:19 19:3 22:8
  24:16 25:3,3,4,7,19
  34:10,14 35:20 36:20
  38:24 39:5,6,6,13,13
  40:22,23
Young 20:1

——— Z ———
Zobel 19:16

——— $ ———
$10,000 32:18
$100 5:11
$15 5:10
$150,000 5:10
$2,000 32:19
$200 5:12 22:11 43:2
$5,000 32:4
$50,000 26:17
$95,000 6:3

——— 0 ———
02110 2:10
02210 1:17,24 2:5
04-10148 3:9
04-10148-RCL 1:5

——— 1 ———
1 1:6,23 2:5 3:6,6
1st 9:23
10-year 25:6
104 41:23 42:18
11 12:3 13:21
11s 29:20
115 14:25
12 25:3 39:6,13

**12s** 29:20
**12th** 36:11
**12-and-a-half-year**
  20:19 25:5
**120** 15:6,7,8,9 20:24
**124** 19:17
**13** 27:7
**14** 19:11
**15** 41:22
**151** 5:9 15:1 19:22 20:5
  22:7 27:25 28:6,8
  35:2 40:17,17
**151-month** 36:9
**16** 19:11 34:14 36:10
  36:11
**17** 31:16
**188** 5:9 15:1
**19th** 14:18
**1981** 23:3

_____ **2** _____
**2:55** 1:6
**20** 4:23 27:5,8
**20-year** 23:2
**2002** 23:3
**2005** 36:14
**2006** 1:6 3:6 36:10
**21st** 10:18,20,23 41:3
**22nd** 10:19,22
**23** 4:6
**23rd** 14:18 31:22
**262** 19:16 20:1
**29** 4:9 5:7

_____ **3** _____
**3** 17:18
**30** 41:10
**32** 4:7
**3553** 10:25 34:19
**3553(a)** 25:9 28:9

_____ **4** _____
**4:00** 45:8
**40** 16:1 37:20
**40-year-old** 19:2
**408** 2:9
**46** 36:14
**466** 31:14
**472** 31:14
**48** 15:8

_____ **5** _____
**5K** 13:18
**5Ks** 36:13,16
**50** 19:3
**500** 40:19
**500-hour** 18:21 43:12
**5204** 1:23
**57** 36:16

_____ **6** _____
**6** 17:20
**60** 31:19
**60s** 16:8
**617-223-8061** 2:10
**617-737-4410** 1:24
**617-748-3100** 2:6
**63** 13:14,16

_____ **7** _____
**77** 6:16 15:9,18
**78** 19:22

_____ **8** _____
**86** 20:5

_____ **9** _____
**92** 14:25 15:3
**9200** 2:5
**96** 20:2